## DISTRICT OF COLUMBIA *v.* ARMES.

1. In a suit against a municipal corporation to recover damages for injuries received from a fall caused by a defective sidewalk, which was in an unguarded condition, it is competent for the plaintiff to show that whilst it was in that condition other like accidents had occurred at the same place.

2. A person affected with insanity is admissible as a witness, if it appears to the court, upon examining him and competent witnesses, that he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue.

ERROR to the Supreme Court of the District of Columbia.

The case is stated in the opinion of the court.

*Mr. Albert G. Riddle* and *Mr. Francis Miller* for the plaintiff in error.

*Mr. Samuel Shellabarger* and *Mr. Arthur A. Birney* for the defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This was an action to recover damages for injuries received by the plaintiff's intestate, Du Bose, from a fall caused by a defective sidewalk in the city of Washington. In 1873, the board of public works of the city caused the grade of the carriageway of Thirteenth Street, between F and G Streets, to be lowered several feet. The distance between the curbstone of the carriageway and the line of the adjacent buildings was thirty-six feet. At the time the accident to the deceased occurred, this portion of the street — sidewalk it may be termed, to designate it from the carriageway, although only a part of it is given up to foot-passengers — was, for forty-eight feet north of F Street, lowered in its whole width to the same grade as the carriageway. But, for some distance beyond that point, only twelve

feet of the sidewalk was cut down, thus leaving an abrupt descent of about two feet at a distance of twelve feet from the curb. At this descent—from the elevated to the lowered part of the sidewalk—there were three steps, but the place was not guarded either at its side or end. Nothing was placed to warn foot-passengers of the danger.

On the night of Feb. 21, 1877, Du Bose, a contract surgeon of the United States army, while walking down Thirteenth Street, towards F Street, fell down this descent, and, striking upon his knees, received a concussion which injured his spine and produced partial paralysis, resulting in the impairment of his mind and ultimately in his death, which occurred since the trial below.

The present action was for the injury thus sustained. He was himself a witness, and it appeared from his testimony that his mind was feeble. His statement was not always as direct and clear as would be expected from a man in the full vigor of his mind. Still it was not incoherent, nor unintelligible, but evinced a full knowledge of the matters in relation to which he was testifying. A physician of the Government Hospital for the Insane, to which the deceased was taken two years afterwards, testified that he was affected with acute melancholy; that sometimes it was impossible to get a word from him; that his memory was impaired, but that he was able to make a substantially correct statement of facts which transpired before the injury took place, though, from the impairment of his memory, he might leave out some important part, that there would be some confusion of ideas in his mind, and that he should not be held responsible for any criminal act. A physician of the Freedmen's Hospital, in which the deceased was at one time a patient after his injuries, testified to a more deranged condition of his mind, and that he was, when there in June, 1879, insane. He had attempted to commit suicide, and had stuck a fork into his neck several times. Upon this, and other testimony of similar import, and the feebleness exhibited by the deceased on the stand, the counsel for the city requested the court to withdraw his testimony from the jury, on the ground that his mental faculties were so far impaired as to render him incompetent to testify as a witness. This the

court refused to do, but instructed the jury that his testimony must be taken with some allowance, considering his condition of mind and his incapacity to remember all the circumstances which might throw some light on his present condition. This refusal and ruling of the court constitute the first error assigned.

The ruling of the court and its instruction to the jury were entirely correct. It is undoubtedly true that a lunatic or insane person may, from the condition of his mind, not be a competent witness. His incompetency on that ground, like incompetency for any other cause, must be passed upon by the court, and to aid its judgment, evidence of his condition is admissible. But lunacy or insanity assumes so many forms, and is so often partial in its extent, being frequently confined to particular subjects, whilst there is full intelligence on others, that the power of the court is to be exercised with the greatest caution. The books are full of cases where persons showing mental derangement on some subjects evince a high degree of intelligence and wisdom on others. The existence of partial insanity does not unfit individuals so affected for the transaction of business on all subjects, nor from giving a perfectly accurate and lucid statement of what they have seen or heard. In a case in the Prerogative Court of Canterbury, counsel stated that partial insanity was unknown to the law of England; but the court replied that if by this was meant that the law never deems a person both sane and insane at one and the same time upon one and the same subject, the assertion was a truism; and added: "If, by that position, it be meant and intended that the law of England never deems a party both sane and insane at *different* times upon the *same* subject; and both sane and insane at the same time upon *different* subjects; (the most usual sense, this last, of the phrase 'partial insanity'), there can scarcely be a position more destitute of legal foundation; or rather there can scarcely be one more adverse to the stream and current of legal authority." *Dew* v. *Clark*, 3 Add. E. R. 79, 94.

The general rule, therefore, is, that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath,

and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself, and any competent witnesses who can speak to the nature and extent of his insanity. Such was the decision of the Court of Criminal Appeal in England, in the case of *Reg.* v. *Hill*, 5 Cox, Crim. Cas. 259. There the prisoner had been convicted of manslaughter; and on the trial a witness had been admitted whose incompetency was urged on the ground of alleged insanity. He was a patient in a lunatic asylum, under the delusion that he had a number of spirits about him which were continually talking to him, but the medical superintendent testified that he was capable of giving an account of any transaction that happened before his eyes; that he had always found him so; and that it was solely with reference to the delusion about the spirits that he considered him a lunatic. The witness himself was called, and he testified as follows: " I am fully aware I have a spirit, and twenty thousand of them. They are not all mine. I must inquire. I can where I am. I know which are mine. Those that ascend from my stomach and my head, and also those in my ears. I don't know how many they are. The flesh creates spirits by the palpitation of the nerves and the rheumatics. All are now in my body and around my head. They speak to me incessantly, particularly at night. That spirits are immortal, I am taught by my religion from my childhood. No matter how faith goes, all live after my death, those that belong to me and those that do not." After much more of this kind of talk he added: " They speak to me instantly; they are speaking to me now; they are not separate from me; they are around me speaking to me now; but I can't be a spirit, for I am flesh and blood. They can go in and out through walls and places which I cannot." He also stated his opinion of what it was to take an oath: " When I swear," he said, " I appeal to the Almighty. It is perjury, the breaking of a lawful oath, or taking an unlawful one; he that does it will go to hell for all eternity." He was then sworn, and gave a perfectly collected and rational account of a transaction which he declared that he had witnessed. He was in

some doubt as to the day of the week on which it took place, and on cross-examination said: " These creatures insist upon it, it was Tuesday night, and I think it was Monday; " whereupon he was asked: " Is what you have told us what the spirits told you, or what you recollected without the spirits? " And he said: " No; the spirits assist me in speaking of the date, I thought it was Monday and they told me it was Christmas eve, Tuesday; but I was an eye-witness, an ocular witness to the fall to the ground." The question was reserved for the opinion of the court whether this witness was competent, and after a very elaborate discussion of the subject it was held that he was. Chief Justice Campbell said that he entertained no doubt that the rule laid down by Baron Parke, in an unreported case which had been referred to, was correct, that wherever a delusion of an insane character exists in any person who is called as a witness, it is for the judge to determine whether the person so called has a sufficient sense of religion in his mind and sufficient understanding of the nature of an oath, for the jury to decide what amount of credit they will give to his testimony.

" Various authorities," said the Chief Justice, " have been referred to, which lay down the law that a person *non compos mentis* is not an admissible witness. But in what sense is the expression *non compos mentis* employed? If a person be so to such an extent as not to understand the nature of an oath, he is not admissible. But a person subject to a considerable amount of insane delusion may yet be under the sanction of an oath and capable of giving very material evidence upon the subject-matter under consideration." And the Chief Justice added: " The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, that his state of mind may be discovered, and witnesses may be adduced to show in what state of sanity or insanity he actually is; still, if he can stand the test proposed, the jury must determine all the rest." He also observed that in a lunatic asylum the patients are often the only witnesses of outrages upon themselves and others, and there would be impunity for offences committed in such places if the only per-

sons who can give information are not to be heard. Baron
Alderson, Justice Coleridge, Baron Platt, and Justice Talfourd
agreed with the Chief Justice, the latter observing that, " If
the proposition that a person suffering under an insane delu-
sion cannot be a witness were maintained to the fullest extent,
every man subject to the most innocent, unreal fancy would
be excluded. Martin Luther believed that he had a personal
conflict with the devil ; Dr. Johnson was persuaded that he
had heard his mother speak to him after death. In every case
the judge must determine according to the circumstances and
extent of the delusion. Unless judgment and discrimination
be applied to each particular case, there may be the most dis-
astrous consequences." This case is also found in the 2d of
Denison and Pearce's Crown Cases, 254, where Lord Campbell
is reported to have said that the rule contended for would
have excluded the testimony of Socrates, for he had one
spirit always prompting him. The doctrine of this decision
has not been overruled, that we are aware of, and it entirely
disposes of the question raised here.

On the trial, a member of the Metropolitan police, who saw
the deceased fall on the sidewalk and went to his assistance,
was asked, after testifying to the accident, whether, while he was
on his beat, other accidents had happened at that place. The
court allowed the question against the objection of the city's
counsel, for the purpose of showing the condition of the street,
and the liability of other persons to fall there. The witness
answered that he had seen persons stumble over there. He
remembered sending home in a hack a woman who had fallen
there, and had seen as many as five persons fall there.

The admission of this testimony is now urged as error, the
point of the objection being that it tended to introduce collat-
eral issues, and thus mislead the jury from the matter directly
in controversy. Were such the case, the objection would be
tenable ; but no dispute was made as to these accidents, no
question was raised as to the extent of the injuries received, no
point was made upon them, no recovery was sought by reason
of them, nor any increase of damages. They were proved
simply as circumstances which, with other evidence, tended
to show the dangerous character of the sidewalk in its un-

guarded condition. The frequency of accidents at a particular place would seem to be good evidence of its dangerous character, — at least, it is some evidence to that effect. Persons are not wont to seek such places, and do not willingly fall into them. Here the character of the place was one of the subjects of inquiry to which attention was called by the nature of the action and the pleadings, and the defendant should have been prepared to show its real character in the face of any proof bearing on that subject.

Besides this, as publicity was necessarily given to the accidents, they also tended to show that the dangerous character of the locality was brought to the attention of the city authorities.

In *Quinlan* v. *City of Utica*, 11 Hun, 217, which was before the Supreme Court of New York, in an action to recover damages for injuries sustained by the plaintiff through the neglect of the city to repair its sidewalk, he was allowed to show that while it was out of repair other persons had slipped and fallen on the walk where he was injured. It was objected that the testimony presented new issues which the defendant could not be prepared to meet; but the court said: "In one sense every item of testimony material to the main issue introduces a new issue; that is to say, it calls for a reply. In no other sense did the testimony in question make a new issue. Its only importance was that it bore upon the main issue, and all legitimate testimony bearing upon that issue, the defendant was required to be prepared for." This case was affirmed by the Court of Appeals of New York, all the judges concurring, except one, who was absent. 74 N. Y. 603.

In an action against the city of Chicago, to recover damages resulting from the death of a person who in the night stepped off an approach to a bridge while it was swinging around to enable a vessel to pass and was drowned, — it being alleged that the accident happened by reason of the neglect of the city to supply sufficient lights to enable persons to avoid such dangers, — the Supreme Court of Illinois held that it was competent for the plaintiff to prove that another person had, under the same circumstances, met with a similar accident. *City of Chicago* v. *Powers*, 42 Ill. 169. To the objection that the evidence was inadmissible, the court said: "The

action was based upon the negligence of the city in failing to keep the bridge properly lighted. If another person had met with a similar fate at the same place and from a like cause, it would tend to show a knowledge on the part of the city that there was inattention on the part of their agents having charge of the bridge, and that they had failed to provide proper means for the protection of persons crossing on the bridge. As it tended to prove this fact it was admissible; and if the appellants had desired to guard against its improper application by the jury, they should have asked an instruction limiting it to its legitimate purpose."

Other cases to the same general purport might be cited. See *Augusta* v. *Hafers*, 61 Ga. 48; *House* v. *Metcalf*, 27 Conn. 631; *Calkins* v. *City of Hartford*, 33 id. 57; *Darling* v. *Westmoreland*, 52 N. H. 401; *Hill* v. *Portland & Rochester Railroad Co.*, 55 Me. 438; *Kent* v. *Town of Lincoln*, 32 Vt. 591; *City of Delphi* v. *Lowery*, 74 Ind. 520. The above, however, are sufficient to sustain the action of the court below in admitting the testimony to which objection was taken.

*Judgment affirmed.*