## CITY OF PORT ARTHUR v.
## WALLACE et al.
### No. 4023.

Court of Civil Appeals of Texas. Beaumont.
Nov. 13, 1942.

Rehearing Denied Dec. 2, 1942.

B. T. McWhorter and Shivers & Keith, all of Port Arthur, for appellant.

Adams, Hart & Daughtry, of Beaumont, for appellees.

WALKER, Chief Justice.

J. C. Wallace brought this suit for himself and as next friend for his minor son, Jack, appellees, against appellant, the City of Port Arthur, for damages for personal injuries received by Jack on the 4th day of October, 1939, in a collision between one of appellant's fire trucks, driven by one of its employees, and an automobile in which Jack was riding, and for expenses incurred by J. C. Wallace. The theory of appellees' petition was that appellant negligently allowed its streets to become full of holes and ridges, which caused the rear end of the fire truck to swerve and strike the automobile in which Jack was riding. Appellant's answer was sufficient to support its points of error. Judgment was in favor of Jack, the minor, on the jury's verdict for the sum of $12,000 and in favor of the father for the sum of $500, from which appellant has regularly prosecuted its appeal.

Appellant's sixth point is that the lower court erred in overruling its motion for a peremptory instruction that, as a matter of law, on the undisputed evidence "there was no proximate causal connection between the condition of the streets at the intersection in question, and the injuries received by the plaintiff." This contention is overruled on the following statement of the evidence. The collision occurred on the 4th day of October, 1939, at the intersection of Stilwell Boulevard and Procter Street, in the corporate limits of the City of Port Arthur.

The City Engineer, on measurements made by him, testified as to the height and depth of the ridges and holes in the street intersection at or near the place of collision, that one depression in the streets had a depth of 1/8th of an inch; another a depth of 1/4th of an inch; another a depth of 1/4th of an inch. There was one ridge with an elevation of one inch. There was a one inch ridge at the intersection, with a rise of about one inch which tapered off as it went north. Glaston Dominque, a former ambulance driver, testified that the proximate height of the ridge across the street was 2 1/2 inches, a condition that had existed as far back as he could remember; as an ambulance driver he always "slowed down right there on both sides of Stilwell * * * on account of it being so bumpy"; the east side of Procter Street had always been pretty bumpy, "and we always slowed down for it"; the ridges slanted up about 14 inches wide; the height of four inches was about the center of the 14-inch mound, about four inches from the general level of the street as it approached the mound. Jerry Borel, the driver of a milk truck, drove his truck along Procter Street over the intersection where the collision occurred; at that point on the 4th of October, 1939, as Procter Street went into Stilwell Boulevard, it "was a sort of corduroy street, with holes in it; there was one high ridge higher than the corduroy effect

generally. In driving over that intersection I would slow down my speed; I had broken three or four quarts of milk going over it; it was too bumpy in that particular section to go over it at the continued rate I was driving; I had been driving a milk truck for sometime, and it was always bumpy." John Patin testified that the ridge across the street at the place of collision was 3½ or 4 inches above the surface of the street, running all the way across the street. J. M. Stansbury testified that when he drove over the intersection in issue he slowed down in crossing it; there were cracked places in the cement; they made it a little rough in travelling over them; those cracks in the cement could have been possibly six inches across, some of them ten inches. J. B. Parker testified that just beyond the intersection was a deep hole in the street; the pavement was broken; he could not tell how deep the hole was, but it was about 2½ feet in diameter, and about 6 or 8 inches deep; the pavement was broken there; there were three or four ridges where the pavement had buckled up; a break in the pavement had formed the ridges; it was rough driving over the intersection; "you used to almost have to come to a stop there at those holes to go on through"; that condition had lasted for quite a while.

We now give the testimony of the parties involved in the collision and of eye witnesses to the collision. Captain Rachel of the Fire Department was riding on the seat with the truck driver at the time of the collision. As the truck entered the intersection it did not jump or jerk in any manner, but made an even right hand turn. The truck was 22 feet long and weighed something over 15,000 pounds. As the truck entered the intersection it did not move to the right nor the left, but went in a straight line until it got into the intersection and turned to the right.

Mrs. Rebecca Wallace, Jack's mother, the driver of the automobile involved in the collision, testified:

"Just before the collision I was travelling east on Stilwell Boulevard, intending to proceed on across Procter street. When I reached the intersection of Stilwell Boulevard and Procter street the light was green. As I approached the intersection I slowed down and changed gears, and was pulling into the intersection on Procter when I heard the siren and bell. I attempted to turn and go in the same direction the fire truck was going, and immediately the crash and collision occurred. I was driving on into the east half of Procter street at that time. Immediately after hearing the siren and bell I turned my automobile north on Procter street, attempting to avoid a collision. The green light did not change while I was in the intersection. I was not travelling fast but had slowed down at the intersection and had shoved the gear in to second. My first thought was to try to avoid it and prevent a wreck. I was trying to turn my Ford to my left and go in a northerly direction, in the same direction the fire truck was travelling. By turning my Ford to the left I gave the fire truck plenty of room to miss my Ford if it had kept its same direction and had gone straight up Procter. While Mr. Rachel was trying to help me out of my car, I said to him, 'Mr. Rachel I did everything I could to avoid that wreck' and he said 'I know you did.' He said that he would not have hit me if he had not skidded. The ridge across the street at that point was high enough to require the driver of an automobile to slow up his car; you had to slow up to pass over that ridge or you would get a jar; if you were going too fast you would get quite a jar. You had to try to avoid those holes; if you could not avoid them and hit them it would jerk your steering wheel. I had had experience before the 4th of October driving over these streets at this point where I could not avoid the holes."

John Patin testified: "At the time of the collision I was about a block away facing Stilwell Boulevard, and about a block from Procter street, and could see the entire intersection. I saw the collision between the Ford automobile and the fire truck. As the fire truck went into the intersection it looked like the driver tried to turn it to the right, and as he did so the back end of the truck swung around and hit the Ford. The back end of the fire truck swung around violently and hit the Ford and turned it over. I do not think the Ford ever stopped; my impression was that it was going forward all the time down Stilwell Boulevard."

The witness Parker testified: "I saw the collision. I saw the rear end of the fire truck coming around, and there was a car across there, and they had swerved to miss it, and I saw the rear end of the fire truck as it struck this car. The front end

of the fire truck was headed up Stilwell; the rear end of it was going around. When I noticed it it was right at the intersection there; the rear end was swerving around. When the fire truck crossed over that ridge its rear end was thrown out of line. The back end of the fire truck jumped as it was crossing the ridge. The back end of the truck, the left rear end of the truck, hit the left rear of the Ford automobile."

T. H. Copeland testified: "I recall a collision in October, 1939, at the intersection of Stilwell Boulevard and Procter Street between a Ford automobile and a city fire truck. I saw the Ford automobile before the collision. The fire truck came up the street and hit the Ford, just as it got across Procter. All of a sudden, it looked like the back end jumped about, I would say a foot or two high, and slid across the street and hit this car. I say that the back end of this fire truck looked to me like it jumped a foot or two, and slid, and hit the car, and knocked it over. That truck went around that corner, and the end jumped up, and slid across and hit the car; it was the rear end of the fire truck that jumped up from one to two feet; the wheels got off the ground and jumped up; of course it didn't stay up in the air; it came down and slid; it slid plumb over until it hit that car; the back end of the truck is what hit; it pivoted on the front wheels. I know that there is a ridge across Procter street immediately at its intersection with Stilwell Boulevard. The jumping of the truck occurred where that ridge is. I say the ridge is about three inches high, something like that, and that is the point where this large fire truck leaped into the air two feet and slid sideways."

The jury found the following issues against appellant on the maintenance of its streets at the point of collision: (a) there were deep holes and high ridges in that part of Procter Street over which appellant's truck was passing immediately before the collision, at or immediately south of the intersection of Procter Street with Stilwell Boulevard; (b) appellant's failure to repair that part of Procter Street by removing the holes and ridges was negligence on its part, which was a direct and proximate cause of the collision between its fire truck and the automobile, and a proximate cause of Jack's injuries; (c) appellant failed to use ordinary care "in maintaining the intersection in question."

Appellant makes no assignment against the findings of the jury convicting it of negligence in maintaining its streets at the place of collision. So, we must accept the jury's findings that the deep holes and high ridges in the streets at the place of the collision were the result of appellant's negligence in failing to maintain its streets.

The point of law now under discussion is appellant's proposition that, as a matter of law, there was no causal connection between the condition of the streets and the collision in which Jack was injured. Appellant contends that the negligence found against it by the jury was too remote; that it was broken by a new and independent cause—the negligence of its truck driver for which it was not liable; and that as a matter of law it was not required to foresee or anticipate that its negligence in failing to maintain its streets could be the proximate cause of a collision between one of its fire trucks and an automobile lawfully using its streets. In Paris & G. N. R. R. Co. v. Stafford, 53 S.W.2d 1019, 1020, writing for the Commission of Appeals, Judge Sharp said: "The rule is well settled that foreseeableness or anticipation of injury is an essential element of proximate cause, and this doctrine is well supported by both federal and state decisions." This proposition by Judge Sharp is clearly the law. In Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.2d 60, 61, writing for the Commission of Appeals, Judge Critz said: "A prior or remote cause cannot be made the basis of an action for damages if it does nothing more than furnish the condition or give rise to the occasion which makes the injury possible, if such injury is the result of some other cause which reasonable minds would not have anticipated, even though the injury would not have occurred but for such condition." Appellant invokes Judge Critz' proposition on its theory that the negligence found against it in maintaining the streets did nothing more than furnish the condition which made the collision possible, even though the collision would not have occurred but for the condition of the streets. These two opinions by Judge Sharp and Judge Critz do not support appellant's proposition that its negligence in maintaining its streets at the point of collision was not, as a matter of law, a proximate cause of the collision. Notwithstand-

ing the negligence of the driver of the fire truck, the evidence raised the issue that the ridges and holes in the streets caused the rear end of the truck to bounce up in the air, and to swing out of a straight line, and to hit the automobile. These conditions in the streets had existed for a long time. The users of the street, with knowledge of this condition, were compelled to slow down their cars in driving over the intersection. The condition of the intersection was sufficiently bad to cause a truck driver to lose control of his car. It broke milk bottles in a milk truck. Proximate cause as a general rule is a fact question for the jury. Foreseeableness is an essential element of proximate cause. On the facts summarized in this paragraph, the issue of foreseeableness was raised as one of fact for the jury. The following fire truck cases, on facts on all fours with the facts at bar, hold cities liable for the damage proximately resulting from the negligence of the city in maintaining its streets, notwithstanding the negligence of the driver of the fire truck, immediately preceding the collision. Hewitt v. Seattle, 62 Wash. 377, 113 P. 1084, 32 L.R.A. N.S., 635; Rollo v. Ogden City, 66 Utah 475, 243 P. 791; Jones v. Sioux City, 185 Iowa 1178, 170 N.W. 445, 10 A.L.R. 474; City of Austin v. Schlegel, Tex.Com.App., 257 S.W. 238. These cases are so well argued and supported by the authorities cited, that a review of them would add nothing to this opinion.

■ Trinity & B. V. Ry. Co. v. McDonald, Tex.Com.App., 208 S.W. 912, does not support appellant's point that, since there had never before been a collision at this intersection between one of its fire trucks and a passenger car, as a matter of law, it was not required to foresee the collision in issue. Appellant's evidence under this proposition simply went to the jury to be weighed with all the other circumstances in the case. Marshall v. San Jacinto Bldg. Co., Tex.Civ.App., 67 S.W. 2d 372; Walgreen Texas Co. v. Shivers, Tex.Civ.App., 131 S.W.2d 650, by Supreme Court, 137 Tex. 493, 154 S.W.2d 625.

Appellant's eighth point is that it was entitled to a peremptory instruction since "it was shown that the operation of the fire truck at the time and place in question proximately caused the collision." This contention is denied.

■ The jury convicted the driver of the truck of certain specific acts of negli-

gence but it found that such negligence was not the sole proximate cause of the collision. Under the law of our Texas decisions appellant was not liable for the negligence of its truck driver. 30 Tex. Jur. 535; Connally v. City of Waco, Tex. Civ. App., 53 S.W.2d 313; Adkinson v. City of Port Arthur, Tex.Civ.App., 293 S.W. 191; Barnes v. City of Waco, Tex. Civ.App., 262 S.W. 1081; Hooper v. City of Childress, Tex.Civ.App., 34 S.W.2d 907; Baker v. City of Waco, Tex.Civ.App., 129 S.W.2d 499. So, had the jury found that the negligence of the truck driver was the sole proximate cause of the injury, then appellant would have been entitled to judgment on the jury's verdict, but, as stated above, that issue was found against appellant. The jury found that the condition of the street was also a proximate cause of the collision, which finding, on our conclusions stated above, has legal support.

■ Appellant moved for judgment notwithstanding the verdict on the theory that, as a matter of law, the driver of the automobile in which Jack was riding was guilty of contributory negligence which was the sole proximate cause of the collision; that her negligence in entering the intersection in front of the fire truck in violation of one of it ordinances "constituted negligence which was the sole proximate cause" of Jack's injuries. This contention advanced as the seventh point of error is overruled. On Mrs. Wallace's testimony, she exercised due care in entering the intersection. Even if it be conceded that she was guilty of negligence in the respect charged by appellant, the issue was for the jury whether such negligence was the sole proximate cause of the collision. That issue was found in favor of appellees. These findings have support in the evidence. Under the evidence the issue was raised that had the truck been driven straight on the collision would not have occurred, and that the condition of the street intersection was a proximate cause of the collision.

■ Appellant makes the point that the court erred in receiving the testimony of Jerry Borel, quoted above, concerning his personal experiences in driving over the intersection. The basis of its exception is that "there was no showing of a similarity of conditions." This contention is overruled. The evidence clearly raised the issue that the intersection had been for a

long time in the condition shown by the testimony as of October 4, 1939. The court did not err in refusing to limit this testimony "for the purpose of showing notice to it" of the condition of the streets, and in refusing to instruct the jury that it "could not consider such testimony as evidence tending to establish negligence." The following authorities support the ruling of the court as against these exceptions by appellant. Dallas Consolidated Electric Street Ry. Co. v. Broadhurst, 28 Tex.Civ. App. 630, 68 S.W. 315; Texas Power & Light Co. v. Bristow, Tex.Civ.App., 213 S.W. 702; Galveston, H. & S. A. Ry. Co. v. Ford, Tex.Civ.App., 46 S.W. 77; Quinn v. Stedman, Town Treasurer, 50 R.I. 153, 146 A. 618, 65 A.L.R. 375 Annotation page 380; McCormick v. Great Western Power Co. of Calif., 214 Cal. 658, 8 P.2d 145, 81 A.L.R. 678, Annotation page 685; Texas Law of Evidence by McCormick and Ray, Section 697, page 905; District of Columbia v. Arms, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618.

About fourteen months after the collision on the 4th of October, 1939, Jack, while cutting kindling wood, was hit in the eye by a piece of kindling. About twenty-six days after this injury to the eye, it was removed. Appellees prayed for damages for the loss of this eye on the ground that Jack would not have lost his right eye had it not been weakened by the injury received in the collision on the 4th of October, 1939; that the loss of the eye was proximately caused by the first injury.

■ Appellant's first and second points are that the court erred in overruling its plea in abatement, based on the contention that appellees failed to give notice of the injury to Jack's eye within the sixty-day period fixed by its charter. We overrule this contention on our construction of the original notice of the first injury, given within the sixty day charter period, that it was sufficient to advise appellant of all injuries to the eye, proximately resulting from the collision. The original notice read: "The apparent extent of said injuries and damages were and are substantially as follows * * * he sustained personal injuries and damages consisting of severe bruises on right side of forehead and face; a severe, deep cut under the left eye, which will leave a permanent scar; also his right thigh bone between knee and hip was broken, completely broken and bones lapped." On the following authorities, the court did not err in overruling the plea in abatement. City of Dallas v. Moore, 32 Tex.Civ.App. 230, 74 S.W. 95; Joy v. York, 99 Me. 237, 58 A. 1059; David v. City of St. Louis, 339 Mo. 241, 96 S.W.2d 353, 106 A.L.R. Annotation page 855; Place v. Yonkers, 43 App. Div. 380, 60 N.Y.S. 171; Annotation 106 A.L.R. 855.

Appellant's third point is that the court erred in overruling its motion for a peremptory instruction, that as a matter of law the injury to Jack's eye was caused solely by the kindling wood incident. The jury found the following facts on the issue of the proximate cause of Jack's loss of his right eye. In the collision on October 4, 1939, he sustained an injury to his eye, which "was a displacement of the lens of the right eye." On or about the 30th of January, 1941, a piece of kindling wood struck Jack "in or on his right eye," which "proximately caused injury to his right eye." The injury sustained by Jack at the time of the collision so impaired the physical condition of his right eye that, but for such impairment, the subsequent injury of January 30, 1941, would not have caused the removal of his right eye. Appellant's negligence in maintaining its streets at the place of collision was a proximate cause of the injury to Jack's eye, which resulted from the collision of October 4, 1939. The loss of Jack's right eye was not the result of an unavoidable accident. The jury assessed damages in favor of Jack in the amount of $12,000; on a separate issue the jury assessed in his favor $5,000 for the loss of his right eye, and for the physical suffering and mental anguish, past and present, directly resulting to him by reason of the injury to and removal of his right eye. The following statement of the testimony supports the jury's finding that the loss of Jack's right eye proximately resulted from the injury received by him in the collision of October 4, 1939, and denies appellant's proposition that the loss of the right eye "was caused solely by the kindling wood incident". Jack received only two licks to his right eye, the injury received in the collision and the kindling wood incident. After his release from the hospital, on his recovery from the injuries received in the collision, he made no complaint of injury to his right eye prior to the kindling wood incident in January, 1941. One afternoon in January, 1941, while splitting kindling wood

a piece of the kindling hit his eye causing it "to water like he had stuck a finger in it or something," and said a stick hit him. He was put to bed and immediately began to complain of his eye. The eye ran water, and was inflamed and swollen. This condition continued for almost a month when Dr. E. W. Vaughan was called in. The eye appeared to be getting worse. Dr. Vaughan came out and examined Jack, and the next day took him to the hospital and removed his right eye.

■ Dr. E. W. Vaughan, an eye, nose and throat specialist, testified: He removed Jack's eye because it was inflamed, apparently about ready to rupture; he had a panophthalmitis, an inflammatory process involving the entire eye; he found the lens in the mid-portion of the posterior chamber about half way back, and the lens was probably fifty per cent absorbed, that is, just dissolved away. He did not know anything about the absorption of the lens when he took the eye out, but removed the eye because it was ready to rupture. The absorption is ordinarily gradual. The absorption was the result of trauma; there is no other way for the lens to get into the posterior chamber of the eye except by dislocation, and you can only dislocate it by some force. It was impossible for the lens to have gotten into the position in which he found it, without some external force putting it there; he did not believe that the kindling wood blow could have caused it without tearing out the eye. The dislocation and absorption in the lens would take some time. He attributed the dislocation of the lens and the absorption to the fire truck accident and not to the kindling wood incident. In this case the lens itself had been bodily pushed back about half way into the posterior chamber. The lens is a round, diamond-like substance, lying back in the middle of the eye; if there were a direct blow from a small object sufficient to dislocate the lens entirely, it would cause some contusion or tearing of the front of the eye, none of which he found in the eye of Jack Wallace. The whole tenor of Dr. Vaughan's testimony was that the kindling wood incident would not have caused Jack to lose his right eye had it not been impaired by the injury received in the collision. The law invoked by appellant's third point now under discussion is stated as follows by Restatement of the Law on Torts (Negligence), § 460: "If the negligent actor is liable for an injury which impairs the physical condition of another's body, the actor is also liable for harm sustained in a subsequent accident which would not have occurred had the other's bodily efficiency not been impaired." See also § 459 of the Restatement and Kirby Lumber Co. v. Ellison, Tex.Civ.App., 270 S.W. 920; Houston & T. C. R. Co. v. Hanks, 58 Tex. Civ.App. 298, 124 S.W. 136; International & G. N. R. Co. v. Duncan, 55 Tex.Civ. App. 440, 121 S.W. 362.

■ The notice given by appellees to appellant on April 8, 1941, advising appellant that Jack had lost his right eye as a proximate result of the injury received in the collision was not subject to the exception that it contained a hearsay transaction with Dr. Vaughan "whereby a causal connection was sought to be established between the accident of October, 1939, and the removal of the eye in 1941." This notice of injury did not mention Dr. Vaughan, nor did it contain a word of conversation with him.

Appellee Wallace did not testify as to any statement made to him by Dr. Vaughan, nor did he give the details of any conversation with Dr. Vaughan. He testified simply that he talked with the doctor shortly after Jack's eye operation. This conclusion overrules appellant's fourth point.

■ The court did not err in permitting appellee Wallace to testify as to the complaints made by Jack of the pain in his eye after the kindling wood incident. These complaints did not constitute self-serving declarations. Roth v. Travelers' Protective Ass'n of America, 102 Tex. 241, 115 S.W. 31, 132 Am.St.Rep. 871, 20 Ann.Cas. 97; Texas Central R. R. Co. v. Powell, 38 Tex.Civ.App. 157, 86 S.W. 21; Dublin Gas & Electric Co. v. Frazier, 46 Tex.Civ.App. 288, 103 S.W. 197; Security Union Casualty Co. v. Frederick, Tex.Civ. App., 295 S.W. 301; Houston & T. C. Ry. Co. v. Shafer, 54 Tex. 641; Texas Law of Evidence by McCormick and Ray, §§ 391, 393 and 366. The fearful condition of Jack's eye was so clearly established that, regardless of the authorities cited above, appellant could not have been injured by the statement of his father that he made complaint of the pain in his eye.

■ In the collision on the 4th of October, 1939, Jack's leg was broken. In April, 1941, while obeying the instructions

of his physician to take exercise to regain the use of his leg, and while walking around the house, this leg gave way again as if he had sustained a second break at the place of the original break. Appellant plead that this incident in the aggravation of the injuries to Jack's leg constituted an unavoidable accident, and the jury found that "the second break" was the result of an unavoidable accident. In entering judgment in favor of appellees the lower court, on their motion, disregarded this finding of the jury. By its ninth point, appellant assigns this ruling as error. The point is overruled. On the undisputed testimony, Jack's leg was not broken a second time; he had an "incomplete union." The callus formation, extra bone thrown off around the break, had not been sufficient to hold the bone. The bone at the point of the original break had not reunited. It appeared, as a matter of law, that the giving away of the bone the second time was the proximate result of the original break.

It follows that the judgment of the lower court should be affirmed, and it is accordingly so ordered.

Affirmed.

COMBS, Justice (dissenting).

In compliance with Rule 463, I state the grounds of my dissent.

On the record, as I view it, the City of Port Arthur is not liable. The only ground of negligence which could serve as a basis of recovery, and which the evidence tended to establish, was the existence of a small ridge in the pavement two or three inches high and eight or ten inches wide, extending across Procter Street at its intersection with Stilwell Boulevard. I think the evidence fails to show that the existence of this ridge in the pavement was the proximate cause of the collision. The fire truck was being driven at high speed when the driver put the brakes on and swerved the truck sharply to the right in an effort to turn down the cross street, Stilwell Boulevard, to avoid striking the Wallace car. The speed and sudden change of direction caused the rear of the fire truck to skid around and strike the Wallace car. The negligent handling of the fire truck, if it was negligent, could give rise to no liability. The majority so hold and counsel for appellees so concede. As I see it, the small ridge in the pavement did not proximately cause the collision. At most, it did nothing more than furnish the condition which made the collision possible. It was not such an obviously dangerous defect as was calculated to visit the City with notice that some such accident as that which occurred, might and probably would result from it. The occurrence not being foreseeable, the evidence failed to establish the issue of "proximate cause," and the defect in the pavement cannot form the basis of an action for damages. Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.2d 60.

I think this case also poses a question of vital concern to the jurisprudence of our State, which is: How far shall our courts go in permitting recovery of damages from cities because of injuries arising from alleged negligence in the maintenance of streets and bridges? It is but common sense to recognize that in the very nature of things a city cannot maintain its streets in perfect condition. A city the size of Port Arthur has several hundred miles of streets, some paved, others shelled or graveled, or simply graded. The wear and tear of traffic and the action of the natural elements present a constant problem of upkeep. Pavements crack, holes develop, culverts rot or rust out, and so on. Any person accustomed to driving upon city streets knows that such defects are common, and it seems to this writer that a proper rule of liability of a city for negligence in the maintenance of its streets should recognize this obvious fact. A city ought not to rest under the duty of providing users of its streets with perfect driving surfaces. Indeed they cannot and no city undertakes to do so.

It seems to me that if damage suits against a city may be predicated upon such minor defects in streets as is shown here, then the people of cities necessarily assume a tremendous burden of public liability when, by their taxes and paving assessments, they undertake to provide and maintain a system of modern public streets. Indeed, this burden may well reach the point of discouraging such improvements. It seems to this writer that the question merits thoughtful consideration of its implications with a view of restating the law of liability in such cases.