Willie CAUGHMAN, Appellant,

v.

The WASHINGTON TERMINAL COM-
PANY, Appellee.

No. 18517.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 18, 1964.

Decided March 4, 1965.

Mr. Melvin Hirshman, Washington, D.
C., with whom Messrs. Earl H. Davis
and Martin Mendelsohn, Washington, D.
C., were on the brief, for appellant.

Mr. Thomas A. Flannery, Washing-
ton, D. C., with whom Mr. Stephen A.
Trimble, Washington, D. C., was on the
brief, for appellee.

Before WILBUR K. MILLER, Senior Cir-
cuit Judge, and WASHINGTON and MC-
GOWAN, Circuit Judges.

WILBUR K. MILLER, Senior Circuit
Judge:

Willie Caughman, a baggage and mail
handler, sued his employer, The Wash-
ington Terminal Company, under the
Federal Employers' Liability Act, 35
STAT. 65, as amended, 45 U.S.C. § 51 *et
seq.*, to recover damages for personal in-
juries alleged to have been sustained as
a result of the employer's negligence.
The jury found for the Washington Ter-
minal Company and Caughman appeals.

It appeared in evidence, over appel-
lant's objection, that he had received ap-
proximately $40.00 per week from the
Railroad Retirement Board for a year
after the injury, and that he was then
receiving public assistance of about
$180.00 per month.[1] This, says the ap-
pellant, violated the "collateral source"
doctrine and was prejudicial error.

Appellee admits that evidence of sums
received by the appellant from collateral
sources was not admissible in mitigation
of damages, but points out that the jury
did not reach the question of damages
and "simply found that the plaintiff had

---

1. In overruling appellant's objection to the
testimony about collateral benefits, the
trial judge said to the jury:
  "Well, I think this all goes to wheth-
  er or not * * * he could get em-
  ployment, or whether or not he wished
  to get employment, and how he has

been living, all to the effect of inform-
ing the jury of the nature of his in-
juries, whether they were serious or
not, and whether they kept him out of
work, and these are all things the
jury will have to consider, from the
evidence."

failed to carry his burden of proof to establish liability." It argues that the receipt of compensation benefits was not introduced as a defense to the suit but merely to determine appellant's credibility "and his motive, if any, in not returning to work." Appellee concedes that, "Had the jury ever reached the question of damages in this case, the inquiry into the receipt of collateral compensation might have required the matter to be remanded for a re-determination of an amount of damages."

Twice recently the Supreme Court has considered a similar problem. In Tipton v. Socony Mobil Oil Co.[2] the suit was brought under the Jones Act, 46 U.S.C. § 688. The principal issue was whether, in view of the nature of the work performed at the time of injury, Tipton was a seaman and so within the coverage of the Jones Act, or an offshore drilling employee. Evidence was introduced, over his objection, that Tipton had accepted compensation benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, which is expressly inapplicable to a "member of a crew of any vessel," 43 U.S.C. § 1333(c)(1).

The Court of Appeals for the Fifth Circuit held it was error to admit evidence of other compensation benefits but found the error harmless "in view of the fact that the jury, having decided the question of status adversely to appellant, never reached the issue of damages. * * *" 315 F.2d 660, 662 (1963).

The Supreme Court said:

"We disagree with the suggestion of the Court of Appeals that the prejudicial effect of the evidence of other compensation would be restricted to the issue of damages and would not affect the determination of liability. That suggestion ignores that the evidence was presumably considered without qualification as bearing on a basic fact essential to liability. * * *"

This can be construed as a holding that such evidence may be received if the jury is instructed to consider it only on the issue of liability. In that event, our question would be whether the trial judge's remarks, reproduced in footnote 1, sufficiently instructed the jury to consider the evidence of collateral benefits only in connection with the liability issue.

But in Eichel v. New York Central Railroad Co.[3] the Supreme Court went further than it did in the *Tipton* case. The Railroad Company, for the purpose of impeaching Eichel's testimony as to his motive in not returning to work and as to the permanency of his injuries, offered testimony that he was receiving disability pension payments under the Railroad Retirement Act. It argued that evidence of the disability payments, although concededly inadmissible to offset or mitigate damages, would show Eichel's motive in not returning to work. The trial court rejected the offered evidence, but the Second Circuit held that it should have been admitted. The Supreme Court said:

"We disagree. In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. Moreover, it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act of 1937, 50 Stat. 309, as amended, 45 U.S.C. § 228b(a) 4, were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act. We have recently had occasion to be reminded that evidence of collateral benefits is readily subject to misuse by a jury. Tipton v. Socony Mobil Oil Co., 375

2. 375 U.S. 34, 37, 84 S.Ct. 1, 11 L.Ed.2d 4 (Oct. 21, 1963).

3. 375 U.S. 253, 255, 84 S.Ct. 316, 11 L. Ed.2d 307 (Dec. 16, 1963).

U.S. 34 [84 S.Ct. 1, 11 L.Ed.2d 4]. It has long been recognized that evidence showing that the defendant is insured creates a substantial likelihood of misuse. Similarly, we must recognize that the petitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact. We hold therefore that the District Court properly excluded the evidence of disability payments. * * *"

Because of this authority, we are constrained to hold it was prejudicial error to receive evidence of sums received by Caughman from the Railroad Retirement Board and from public assistance. The judgment of the District Court will be reversed and the cause will be remanded for a new trial at which such evidence will be excluded.

Caughman also assigned as error the showing of motion pictures of his activities which tended to contradict his testimony about the extent of his injuries, and the trial judge's refusal to permit him to introduce evidence of the Terminal Company's previous practices relating to the handling of mail sacks, as well as the failure to instruct on the "non-delegable duty" of the Company. As these questions may arise at a new trial, we think it well to indicate now that we consider that Caughman's contentions in respect to them are insubstantial.

Reversed and remanded.

WASHINGTON, Circuit Judge (concurring in the result):

I agree that this judgment should be reversed under the *Eichel* decision of the Supreme Court, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963). Under these circumstances, I agree that it is appropriate to comment on issues raised by the parties which are likely to arise in a new trial. However, I think that the important matters dealt with in dictum in the last paragraph of the majority opinion require a somewhat fuller consideration.

The opinion characterizes as "insubstantial" the appellant's assertion that "the trial judge's refusal to permit him to introduce evidence of the Terminal Company's previous practices relating to the handling of mail sacks" was error. Appellant had tried to introduce evidence of two separate but related practices. First, he wanted to show that two men were used to stack heavy mail sacks in the past; second, that requests by individuals for help in stacking heavy mail sacks had in the past been frequently denied. The opinion of the court might be read as indicating that evidence of all past practices should be excluded in a new trial. The trial judge in the first trial seemed to think that this was the proper rule. Several times he instructed appellant's counsel to "restrict your proof to the day of the accident."

In my view, the majority opinion should not be read as compelling this narrow view of admissibility. Indeed, the appellant concedes that it is appropriate to accept evidence on past practices going to plaintiff's first point—that two men had often been used to stack heavy sacks in the past.[1] As I read the majority opinion, it finds that appellant has not shown error in the exclusion of evidence of past practices on this record. It does not foreclose the admission of such evidence in a new trial, at the discretion of the trial judge. According to McCormick, evidence of custom of business operations is usually admissible where practices are "reasonably regular and uniform." McCormick, Evidence 343 (1954). If the custom of business operation is relevant to appellant's theory of recovery, evidence going to establish what that custom was should be admitted. Cf. District of Columbia v. Armes, 107 U.S. (17 Otto) 519, 2 S.Ct. 840, 27 L.Ed. 618 (1882).[2]

---

1. As to this matter, appellee argues that appellant had adequate opportunity to, and did in fact, put on testimony. We need not consider this contention since we are reversing on other grounds.

2. The trial court must determine whether probative value outweighs the risk of unfair prejudice to the defendant. An isolated act of negligence by an employee is inadmissible to prove that he was neg-

The admissibility of the motion pictures should be left to the discretion of the trial judge. McCORMICK, EVIDENCE 388–89. They were introduced as being relevant to establish the extent of appellant's injuries and to attack his credibility. Appellant's objection to their admission is not insubstantial. Motion pictures tend to divert the attention of the jury from the issues in the case. Here the motion pictures do not contradict appellant's testimony with respect to his injury in any significant feature. His testimony about his residual injuries is compatible with the activities seen in the movies: driving a car, carrying packages, walking up stairs. Appellee urges here that the motion pictures were relevant to dispel the idea given by the appellant in the courtroom that he had a very limited degree of mobility. Clearly, it would be appropriate for the judge in the new trial to observe the movements of the appellant in the courtroom, then decide whether the motion pictures are necessary or helpful to give the jury a true impression of the severity of appellant's residual injuries. The judge can first view the motion pictures out of the presence of the jury, as did the judge in the first trial.

Appellant also asserts that the motion pictures are "prejudicial" because they showed him "hustling," that is, hiring out his car to drive persons home from the welfare food station with their packages of surplus food. In his cross-examination of appellant, defense counsel intensively questioned him, trying to establish that he was a "hustler." The suggestion that he was a "hustler" was prejudicial, for a reason expressed by defense counsel in a bench conference: "There was a scandal in the newspapers, it was quite a racket * * *." There was a significant discrepancy in the testimony of appellant and his observed behavior on the film, which made the "hustler" issue relevant for purposes of impeachment, although prejudicial because it imputed participation in a "racket" to the appellant. The admissibility of such material depends on a balancing of the value of the testimony for impeachment purposes against its possibly prejudicial effect on the party's case. The extent of permitted cross-examination and the admissibility of extrinsic evidence in matters of this sort must largely be left to the discretion of the trial court.

The hustler point becomes more disturbing, however, because of the part it plays in an apparent attempt by defense counsel to paint a dark picture of defendant's general character. According to Wigmore, evidence on the character of a party in a civil suit is generally inadmissible. I WIGMORE, EVIDENCE § 64 (1940). The reasons for this rule are that a party's character usually has no probative value; and that evidence going to character diverts attention from the disputed issues to the prejudice of a party. On the other hand, character as it relates to credibility might be relevant where, as here, a party's credibility is one of the pivotal questions in the case. However, much of the matter elicited by defendant did not go to credibility in any proper sense; rather it was an attempt to portray appellant as a generally immoral person. The credibility issue should not open the door to an attack on a party's general character.[3] Six pages of the transcript record the extensive cross-examination of appellant on his disorderly domestic relations—his illegitimate

---

ligent at the time of the accident sued on. Small v. Pennsylvania R. Co., 65 App.D.C. 112, 115, 80 F.2d 704, 707 (1935), cert. denied, 297 U.S. 724, 56 S. Ct. 669, 80 L.Ed. 1008 (1936).

3. "Obviously the character of a witness for truthfulness or mendacity is material circumstantial evidence on the question of the truth of particular testimony of the witness. The discussion of the rules which have developed as to character-impeachment will reveal certain general questions of balancing policies. Among them are these: How far in any particular situation does the danger of unfair prejudice against the witness and the party calling him from this type of impeachment outweigh the probable value of the light shed on credibility? Again, should the field of charac-

children, his common law wife, his divorce. Defense counsel elicited the fact that appellant had been convicted of a violation of the Internal Revenue Code for the sale of unpackaged liquor in 1941. He tried to establish that appellant had had a poor work record. He tried, in general, to establish that appellant was a "welfare chiseler": he had not been diligent in seeking work; he had not sought education or retraining that would fit him for a different kind of work; he took a taxi to a doctor's office rather than a bus; and he was a "hustler." Some of this was relevant to the question of damages; but it also had the prejudicial effect of creating the impression that appellant was a person undeserving of compensation. That this was the drift of the case as presented was suggested by a number of questions to the appellant about the make and year of his wife's automobile, a question that seems to reflect the popular idea that "welfare chiselers" frequently drive flashy late-model cars.

In my view, the defendant should be cautioned against a repetition of this attempt to discredit the plaintiff by appeals to community bias. The cross-examination regarding appellant's family relations and his conviction was clearly irrelevant. The evidence on whether appellant was a hustler was relevant to his credibility and to the measure of damages; but it was also highly prejudicial, in that it suggested that appellant was an undeserving person.

The *Eichel* case, relied on in the opinion of the court, stresses the risk that evidence intended to go only to damages may prejudice the plaintiff's case on the general question of defendant's liability. It is true that malingering or income from another source might be relevant to

diminish the damages claimed by plaintiff. But where the evidence going to establish malingering is part of a pattern of attempts to show that a plaintiff is a worthless person, and where the source of income is one associated with scandal, the trial court should exercise its discretion in deciding whether their value in determining damages outweighs their prejudice to plaintiff.

---

ter-impeachment be limited so far as practicable to attack on the particular character-trait of truthfulness or should it extend to 'general' character for its undoubted though more remote bearing upon truthfulness, on the notion that the greater includes the less?

"It seems probable, moreover, that the tendency, particularly in civil cases, is to

use this form of attack more and more sparingly. It was part of the melodrama of the pioneer trial to find 'the villain of the piece.' It fits less comfortably into the more business-like atmosphere of the present court-room." McCormick, Evidence 86.