**UNITED STATES of America, Appellee,**

v.

**Edward Louis GEBHART, Appellant.**

**No. 20401.**

United States Court of Appeals, Eighth Circuit.

Feb. 3, 1971.

M. J. Galvin, Jr., St. Paul, Minn., for appellant.

J. Earl Cudd, Asst. U. S. Atty., Robert G. Renner, U. S. Atty. for District of Minnesota, Minneapolis, Minn., for appellee.

Before MEHAFFY and HEANEY, Circuit Judges, and MEREDITH, Chief District Judge.

MEHAFFY, Circuit Judge.

This appeal is from a conviction after jury trial of the defendant for aggravated bank robbery by taking $4,243.00 from the FDIC insured State Bank of Bricelyn, Minnesota, in violation of 18 U.S.C. § 2113(a) and (d).

The issues are stated by defendant as (1) should defendant be acquitted when to establish his presence at the scene of the crime the government presented seven witnesses but the only positive identification was made by the accomplice; (2) was the witness competent to testify when he was admittedly mentally ill, addicted to drugs and under their influence while testifying, and had been characterized by a court-appointed psychiatrist as a person who "obviously lies;" and (3) whether a new trial should be granted when the accomplice made a statement after trial that defendant did not participate in the crime.

The bank was held up by two armed men on the morning of September 2, 1969 and the robbers obtained approximately $4200.00 from the bank. One of the men was short and the other tall. The accomplice in this case was Mark Anthony Jenson and he was a short man. Defendant was the tall man who participated in the robbery and he was wearing a hat and sun glasses at the time. While some of the witnesses could not positively identify defendant, an assistant cashier identified him as resembling the robber. Also, the cashier identified defendant as resembling the man who accosted him in the hallway of the bank. Jenson, the accomplice, identified defendant as the taller man who participated with him in the robbery.

Jenson met defendant about three weeks prior to the robbery while Jenson and his wife were hitchhiking in Missouri. They accompanied defendant to California and then to Altoona, Pennsylvania. Jenson and defendant drove from Altoona to Bricelyn in defendant's blue Chevrolet convertible. In Iowa they stole some Iowa license plates which they placed over the California plates on defendant's car. This transfer of plates was made at a cemetery located one mile west of Bricelyn. They proceeded to Bricelyn and parked in front of a cafe where they purchased soft drinks and then proceeded to the bank. A witness in the cafe thought defendant resembled the taller of the two men.

The two robbers entered the bank. Defendant approached the first teller

and displayed his gun. Jenson proceeded to the tellers' working area and displayed his gun. They were unable to obtain any money from the vault but robbed the tellers' cages and locked the employees of the bank in the vault and left through the rear exit. They left Bricelyn by proceeding south on a gravel road and abandoned a hat and pants worn during the robbery. The hat had imprinted on its band "Goldberg's, Altoona," and was located in a ditch near the cemetery where the stolen license plates had been attached to defendant's car. The robbers proceeded towards Altoona, Pennsylvania, and Jenson separated from defendant in Ohio, defendant telling him that he was returning to Altoona.

Two days after the robbery defendant purchased a used Cadillac from a dealer in Altoona, paying him with seven one hundred dollar bills. Defendant told the salesman that his Chevrolet had a "blown" engine and he wanted the Cadillac to tow it to California. The Chevrolet was observed in the parking lot of a bar and later was discovered abandoned on a residential street in Altoona. It was in operable condition.

About the middle of the month defendant told Zoltan Kiss that he had won $2,000.00 in a blackjack game in Las Vegas, and also about that time he told one Baker, a longtime friend, who asked him about his involvement in the bank robbery that he would "neither admit nor deny" it.

■ We discuss the sufficiency of the evidence issue first. It has long been the rule in this circuit that a conviction may rest on uncorroborated testimony of an accomplice. We have so held many times. We said in Harris v. Ciccone, 417 F.2d 479, 487, 488 (8th Cir. 1969), cert. denied, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970):

> "Our rule is clear that a conviction may rest even upon the uncorroborated testimony of an accomplice if that testimony is not otherwise unsubstantial on its face. (Citing cases.)"

But the conviction here did not rest solely on the testimony of the accomplice Jenson. There was solid evidence otherwise for the jury to find that defendant was one of the participating robbers. There was the testimony of the two bank employees that defendant resembled the robber. A witness testified that in the early morning of the day of the robbery he had observed a convertible and two men parked in the cemetery one mile west of Bricelyn and that the color combination of the car was similar to defendant's car. Another witness testified that a car similar to defendant's was parked outside the cafe shortly before the robbery and still another witness testified that shortly after the robbery he observed a blue convertible similar to defendant's car a short distance south and slightly west of Bricelyn speeding south on a gravel road. The accomplice had testified that the hat worn by defendant was abandoned after the robbery. It was found in the cemetery where the stolen plates had been placed on the car.

In a case like this it is of no consequence if some of the witnesses could not make positive identification of defendant. See United States v. Valez, 431 F.2d 622 (8th Cir. 1970). Here, there was ample evidence to support the verdict of conviction, and it is settled law that we must take the view of the evidence most favorable to support a verdict. McClard v. United States, 386 F.2d 495, 497 (8th Cir. 1967), cert. denied, Ussery v. United States, 393 U.S. 866, 89 S.Ct. 149, 21 L.Ed.2d 134 (1968).

■ Next, defendant argues that the court erred in permitting Jenson, the accomplice, to testify because it is asserted that Jenson was an incompetent witness. There is in the record a report of the Minnesota Security Hospital which found Jenson competent to stand trial in a robbery charge pending in the Minnesota courts. There is also a report by a psychiatrist appointed by the trial court finding Jenson competent to stand trial in this case.

When objection to the testimony of this witness was first made, the court overruled the objection reserving the right to reconsider it if anything occurred during Jenson's testimony. Defendant renewed his objection at the conclusion of Jenson's testimony in his motion for new trial. There is an interesting dissertation on this subject by Judge Johnsen, our former Chief Judge, in Carter v. United States, 332 F.2d 728, 729-730 (8th Cir. 1964), cert. denied, 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47 (1964). At the commencement of Judge Johnsen's discussion he calls attention to the old case of District of Columbia v. Armes, 107 U.S. 519, 2 S.Ct. 840, 27 L. Ed. 618 (1882), and observes that the rule laid out there is so firmly settled in the federal judicial system that thereafter there has been no problem in relation to it. He quotes from Mr. Justice Field's opinion as follows:

"'The general rule * * * is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court * * *'". (332 F.2d at 729.)

There is nothing in the medical reports that would indicate that the accomplice in this case did not understand what he was saying or understand the obligation of oath. The report from the Minnesota Security Hospital on Jenson's mental status contains the following paragraph:

"I can see nothing in this young man that suggests to me that he is unable to cooperate with his attorney in his defense or would suggest that he is unable to understand the nature of the charges against him. Based only on the information that I have obtained from my interview, I would suggest

that this young man be certified to court as competent to stand trial."

The report of the doctor appointed by the trial court to examine Jenson states:

"(1) Mark Jenson currently is not insane or psychotic.

"(2) At this time, Mark Jenson can understand the nature of the charges against him, can understand the nature of the trial proceedings and can assist counsel in his defense.

"(3) Mark Jenson is mentally competent to testify as to past events in his life. There is no disturbance as to clarity of thoughts and no apparent amnesia or memory deficit.

\* \* \* \* \* \*

"(10) He claims to be taking psychiatric medications at this time. These will not interfere with the clarity of his thinking. He should not be considered incompetent because of medication."

The medication which it is asserted the accomplice was taking was a strong tranquilizer. If the use of tranquilizers would make a person incompetent to testify, a large segment of highly intelligent people in this country would be unfit witnesses. As in the case of Sherburne v. United States, 433 F.2d 1350 (8th Cir. 1970), the doctors here knew that he used such medication. In this case, however, one of the doctors testified as shown above that it would not affect his mental competency. In addition, this question was raised before the witness testified and the court was made aware and had the opportunity to observe this witness throughout his testimony and, of course, was in a much better position than a reviewing court to pass on the witness' competency because of use of drugs or presently asserted mental incompetency.

Finally, it is contended that a new trial should be granted because the accomplice admitted after the trial that he had testified falsely and that defend-

ant was not a participant in the crime. Motions because of newly discovered evidence are addressed to the sound discretion of the judge who presided at the trial and the applicable standard on appellate review is whether that discretion has been abused. Batsell v. United States, 403 F.2d 395 (8th Cir. 1968), cert. denied, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969); McCroskey v. United States, 339 F.2d 895, 897 (8th Cir. 1965).

■ Support for defendant's argument in this case consists of affidavits filed by jailmates of the accomplice and of defendant. It is significant that we have not been furnished an affidavit by Jenson. Obviously he made none. The inmates' statements were to the effect that the accomplice said he would testify against his mother to get a lesser sentence, and that further he said that after he had done his five years he would try to help Gebhart, the defendant. One of the affidavits states that in reply to inquiry of one of the inmates as to whether defendant robbed the bank the accomplice stated: "No. But I am going to take care of him as soon as I get out." It is true that one of the psychiatrists said the accomplice was prone to lie, but the trial court had the full report and observed the witness. The fact that he made a different statement after his own conviction and while in jail with other felons is not particularly startling as when he made such statement that he intended to help defendant when his term was served, he was most likely trying to justify his violation of the code of the underworld in testifying against a partner. In any event, the evidence in this case was sufficient to convict defendant without the accomplice's testimony, and furthermore the questions presented by the newly discovered evidence were very properly, especially in this case, for the trial court to determine.

We find no reversible error and the judgment of conviction is affirmed.