**UNITED STATES of America,**
**Plaintiff,**

**v.**

**George J. DAILEDA and August J. Lippi, Defendants.**
**Crim. No. 13711.**

United States District Court
M. D. Pennsylvania.
May 12, 1964.

Bernard J. Brown, U. S. Atty., Carlon M. O'Malley, Jr., Asst. U. S. Atty., Scranton, Pa., for plaintiff.

Edwin Kosik, James Walker, Scranton, Pa., for defendants.

NEALON, District Judge.

The defendant, August J. Lippi, having been tried by a jury and convicted on 34 Counts of violations of Title 18 U.S.C. §§ 2, 656, 1001 and 1005, has filed this motion for judgment of acquittal and, in the alternative, a new trial.

The defendant, President of the First National Bank of Exeter, Pennsylvania, was indicted together with George Daileda, Cashier of the Bank, but at the time

---

1. Title 18 U.S.C. 2, the aiding and abetting statute provides:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

of arraignment Daileda entered a plea of guilty to the 34 Counts in the indictment and subsequently testified for the Government at the defendant's trial.

The indictment charged the defendant, in the first 27 Counts, with having

(a) Willfully, knowingly and fraudulently aided and abetted George J. Daileda, who was the cashier of said bank, in the misapplication of funds of the said bank by drawing and presenting for payment at the said bank various checks, at a time when he knew that he did not have sufficient funds in his account to pay said checks, and inducing, aiding and abetting the said Daileda to misapply funds of the bank to cover said checks, with intent to defraud and injure the said First National Bank of Exeter, in violation of 18 U.S.C. 2[1] and 18 U.S.C. 656;

in Counts 28, 29 and 30, with having

(b) Willfully, knowingly and fraudulently aided and abetted the said Daileda in the making of false entries in the books and records of The First National Bank of Exeter with intent to deceive the Federal Deposit Insurance Corporation and agents and examiners thereof, and with intent to injure and defraud the said First National Bank of Exeter, in violation of 18 U.S.C. 2 and 18 U.S.C. 1005;

and in Counts 31, 32, 33 and 34, with having

(c) Knowingly, willfully and fraudulently filed and caused to be filed with the Comptroller of Currency false and fraudulent "Reports of Conditions" of the First National Bank of Exeter, in violation of 18 U.S.C. 1001.

The reasons assigned by defendant will be considered in the following order:

*Motion for Judgment of Acquittal*

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

The defendant contends that the Court erred in denying his motion for acquittal made initially at the conclusion of the Government's case and again at the close of all the evidence. Defendant's principal argument is that the Government's own evidence negated the requisite intent in such cases.

■ There is no doubt that it is incumbent upon the Government to prove that there was a willful misapplication of the funds of the bank by Daileda and that the defendant knowingly and willfully, with specific intent, aided and abetted Daileda in the misapplication. There can be no question but that there was a willful misapplication of funds, but defendant contends that the Court should have taken the case from the jury as there was insufficient evidence of specific intent on his part to justify a conviction.

The Government's evidence revealed that (a) defendant first approached Daileda in 1942, told him that he had sustained expenses for household improvements, and asked him to cover up certain checks drawn to pay these expenses inasmuch as defendant did not have sufficient funds in his checking account; (b) Daileda told defendant he would cover up these checks, but that he had to use bank funds to do it; (c) this practice continued up to September, 1959, and defendant would take from nine months to a year and a half to reimburse the Cashier for bank funds used during this period; (d) from September, 1959, to January, 1962, the period involved under the present indictment, defendant, then President of the Bank, issued twenty-seven checks when, in each instance, there were insufficient funds in defendant's checking account; (e) the Cashier during the indictment period told the defendant that bank funds were being used and repeatedly asked him to refund the money, whereupon in one instance defendant exclaimed "What the hell good is this bank if I can't use it?"; (f) during the indictment period the defendant made no deposits in his checking account; (g) the bank ledger cards and other evidence revealed that on the day each check was cleared, either a sufficient deposit was made at that time to cover the check or Daileda produced cash and "bought back" defendant's check which was being held up by the head teller inasmuch as the balance in the checking account was inadequate; (h) the total amount covered by Daileda for the defendant was $38,976.88; (i) in maintaining bank records, false entries had to be made by Daileda to conceal the $38,976.88 misapplied; (j) in submitting financial statements to the Comptroller of Currency, false and fraudulent representations were made in order to conceal the $38,976.88 misapplied; (k) at the time financial statements, viz. "Reports of Conditions", were presented to defendant for his signature, defendant and the Cashier would discuss the need for defendant to reimburse the bank for deposits withheld; (l) defendant did sign the "Reports of Conditions" which were then forwarded to the Comptroller of Currency. Further, the Government's evidence indicated how and where the false entries and fraudulent statements were made. The Government's proof disclosed that the defendant was the President of the First National Bank of Exeter during the period in question, was very active in the conduct of its business, and visited the bank and consulted with the Cashier, Daileda, two to three times a week. The Government maintained, with apparent success, that this knowledge of the internal operation of the bank, coupled with the other evidence showing defendant's actual participation in diverting bank funds, demonstrated that defendant was familiar enough with bank records and documents to know that false entries were being made and fraudulent statements submitted.

■■ Certainly there was ample evidence to warrant the submission of this case to the jury. Defendant's intent was a factual issue and specific intent may be inferred from all the relevant circumstances, since direct proof of intent is rarely available. Benchwick v. United States, 297 F.2d 330 (9th Cir. 1961); United States v. Nystrom, 237

F.2d 218 (3d Cir. 1956); Hall v. United States, 286 F.2d 676 (5th Cir. 1961). If, with knowledge of the fraudulent misapplication by the Cashier, the defendant continued to engage in a course of conduct which so misapplied the funds of the bank and which required the expected collaboration of the Cashier to make it successful, * * * the evidence was sufficient to take the case to the jury on the issue of aiding, abetting, or inducing. Logsdon v. United States, 253 F.2d 12 (6th Cir. 1958). See also, United States v. Speare, 297 F.2d 408 (2d Cir. 1962). It is not necessary that an aider and abettor know the modus operandi of the person whom he is charged with aiding and abetting; it is sufficient to show that the defendant shared the Cashier's criminal purpose to injure and defraud the bank. McClanahan v. United States, 230 F.2d 919 (5th Cir. 1956); Russell v. United States, 222 F.2d 197 (5th Cir. 1955). Knowledge of the Cashier's specific acts of concealment would have been relevant evidence that defendant had the requisite intent, but it was not the only evidence. Benchwick v. United States (supra).

█ Defendant points out that Daileda testified that defendant promised to pay back the amounts covered; that in all instances up to September, 1959, the defendant did, in fact, repay bank funds used for checks that were covered by Daileda; that defendant not only specifically denied involvement, but was a man of some financial means who would have no need to cover his bank obligations, all of which, according to defendant, thoroughly weakened the Government's case.

However, these matters were for the jury to consider in arriving at its decision concerning the existence or nonexistence of specific intent. To maintain that this testimony so negated the requisite intent as to require the Court to remove the case from the jury and direct a verdict of acquittal is absurd and without merit.

█ The jury could very well have concluded that during the indictment period from September, 1959, to January, 1962, the defendant issued twenty-seven checks drawn on his checking account in which he knew there were insufficient funds; that he knew, as a result of an arrangement and understanding with Daileda, that Daileda would cover these checks with bank funds; that it was his intention to injure and defraud the bank when he issued the checks; that this intention to defraud was apparent because defendant made no attempt, during the indictment period, despite repeated requests by Daileda, to deposit any money in his checking account; that he intended " * * * to use the bank * * * " for a criminal purpose; that he knew Daileda made false entries in bank records to cover these transactions; that he knew when he signed the "Reports of Conditions" that they had been fraudulently prepared to conceal the exact condition of the bank, and that he acted willfully, feloniously, and with specific intent to injure and defraud the First National Bank of Exeter. The defendant was allowed to present his version of these transactions and, after a fair charge by the Court, to which no exceptions were taken, the jury declined to accept it. Under these circumstances, the Court has no right to disturb the jury's findings.

### Motion for a New Trial

The numerous reasons assigned in support of the motion for a new trial can be distilled into three principal arguments: (a) the Court erred in admitting evidence of alleged prior similar offenses, (b) the Court erred in restricting the cross-examination of a Government witness, and (c) the Court erred in not permitting a psychiatrist to testify as to the credibility and bias of a Government witness.

█ As to the evidence of alleged prior similar offenses, the Government witness Daileda was allowed to testify that in 1942, while defendant was build-

ing an apartment over his garage, he came to Daileda, told him he didn't have enough funds and asked Daileda to make good some checks he was going to use to pay these building expenses. Daileda covered checks amounting to approximately $6,000, after explaining to defendant that he would have to use bank funds. Defendant paid the $6,000 back in approximately nine months. At the time this testimony was received, the Court specifically instructed the jury that the evidence was being allowed for a limited purpose, i. e., for the purpose of showing intent and knowledge during the indictment period from September, 1959, to January, 1962, when the misapplications were being made by Daileda. The Court advised the jury, inter alia:

" * * * We are going to allow testimony concerning acts or discussions or events prior to 1959, but solely for the purpose of bearing on the defendant's knowledge and on the defendant's intent, and not in any way to be considered by you as establishing the commission of crimes during the period 1942 to 1959. We're not concerned with crimes or offenses as such during that period. We are concerned with whether or not this defendant is guilty of the crimes with which he's been charged during the period 1959 to 1962, and to that extent and toward that end we will allow this witness to testify how this alleged scheme or plan originated, and, once again, to be considered by you solely as bearing upon the intent and knowledge of this defendant relative to the crimes with which he's been charged during the period 1959 to 1962, and for that limited purpose we will allow this testimony and we will overrule the objection of the defendant."

(N.T. 136–137)

Subsequently, during the charge of the Court, this admonition was repeated. This testimony was allowed because it was germane to the issue of knowledge and intent. Daileda's testimony was to the effect that this collaboration with the defendant had its beginning in 1942 and continued through the 1940's and 1950's, up to January, 1962, and that during this period he repeatedly told defendant that he was using bank funds and insisted that the funds be restored. So that when the transactions during the indictment period came into being, a well formulated plan of operation, known to defendant, was already in existence. Therefore, concerning the knowledge and intent of defendant from September, 1959, to January, 1962, this evidence was extremely pertinent and the jury should have had the benefit of it.

 As to the limitation of the cross-examination of Daileda, it is axiomatic that the extent of cross-examination is a matter resting within the sound discretion of the trial Court. United States v. Stoehr, 196 F.2d 276, 33 A.L.R. 2d 836 (3d Cir. 1952), certiorari denied 344 U.S. 826, 73 S.Ct. 28, 67 L.Ed. 643. The cross-examination of Daileda was allowed over a wide range of subjects, including private business transactions of the witness, his role in a prior defalcation by the former Cashier, alleged indiscretions with female employees which purportedly led to his separation from the bank, and other matters which may have had a bearing on his credibility. He was subjected to an extensive and searching cross-examination. However, when defense counsel attempted to cross-examine Daileda concerning his alleged inconsistent statements in admittedly unrelated criminal proceedings involving this defendant and pertaining to unrelated subject matter, the Government, citing United States v. Klass, 166 F.2d 373 (3d Cir. 1948), entered an objection contending that Daileda was not arrested, tried or convicted of perjury in these other cases and, consequently, absent evidence of a conviction, this line of questioning could not be utilized to impeach credibility. See also Cwach v. United States, 212 F.2d 520 (8th Cir. 1954). Defense counsel then expanded his reason for pursuing

this line of inquiry, alleging that Daileda had testified in Court and given statements to Government investigators in these unrelated cases which was favorable to the defendant and then, after the witness was discharged from his position as bank Cashier, supposedly at the behest of defendant, he subsequently changed his testimony and implicated the defendant, all of which, according to the defense, was pertinent on the question of bias and hostility. After cautioning defense counsel " * * * I don't want to plunge this case into completely collateral and unrelated issues that may tend to confuse the jury and somehow submerge the true issues in this case * * * ", the trial Court limited any excursion into collateral matters, but permitted defense counsel to proceed, as follows:

"THE COURT: Now, I'm not closing the door to the developing of evidence or testimony concerning this witness's prior testimony in Wilmington, before the Grand Jury or in the statements to the Government investigators if properly tied in so as to show bias or hostility which may qualify as impeaching evidence. Is that understood?

"MR. KOSIK: Yes, sir." (N.T. 370)

Therefore, if there was any limitation on cross-examination, it was a proper and, indeed, a modest one and left defense counsel free to develop his theory of bias and hostility.

The other exception advanced by defendant is that the Court erred in sustaining the Government's objection to the proposed testimony of Dr. Theodore Kushner. According to defendant's offer, Dr. Kushner, a psychiatrist, was prepared to testify that, although the witness Daileda was not psychotic or insane, " * * * he is a psychopath; that he is capable of lying; that from his examination here he feels that this witness lacks guilt; that he will lie under circumstances such as this; that he has no hesitation in involving this defendant or any other person." It is

conceded that Dr. Kushner never treated Daileda, never examined him, never saw him prior to this trial and that his examination of the witness was limited to having observed him testify in this courtroom for approximately seven hours on direct and cross-examination. The Government objected to this testimony, contending (1) it would be improper to allow an expression of professional opinion as to the credibility of a witness; (2) it was an usurpation of the function of the jury; (3) a medical conclusion that Daileda was capable of lying was meaningless and of no aid to the jury, and (4) there was no foundation laid for the reception of this testimony.

"As a general rule, one witness may not give his opinion as to the credibility of another witness. It is improper to adduce testimony that in the opinion of one witness another witness is not telling the truth. An expert cannot be asked to give his opinion on conflicting testimony since to do so he must invade the province of the jury and pass on the credibility of witnesses." 1 Conrad, Modern Trial Evidence, § 667, pp. 555–556 (1956)

Although there has been a tendency in some instances toward a relaxation of this rule, special circumstances must exist for recognizing an exception to the rule. For example, in United States v. Hiss, 88 F.Supp. 559 (D.C.N.Y.), a psychiatrist was allowed to testify and to give expert testimony impeaching the credibility of the Government's principal witness. However, it is apparent from the opinion that the Court predicated its ruling on the contended insanity or mental derangement of the witness. Moreover, it was a perjury trial in which the testimony of the witness attacked was indispensable and an exhaustive summary of his background, peculiarities and life-time activities was made available to the psychiatrist. This was obviously considered because the Court, when the evidence was allowed, stated: " * * * under the circumstances in this case, and in view of the foundation which has been

laid, I think it should be received." Obviously, the reception of this type of testimony is fraught with danger and great caution must be exercised before this precarious step is taken. It may well open a Pandora's box of diversion, confusion, and remoteness, and the remedy may be more dangerous than the disease it seeks to cure. In United States v. Rosenberg, D.C.N.Y., 108 F. Supp. 798, affirmed 2d Cir. 1952, 200 F.2d 666, certiorari denied 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384, the Court rejected similar testimony, commenting:

> "There may be some rare instances when a trial judge permits testimony by medical experts as to the competence or probity of a witness when appraised solely on his mental ability to testify truthfully,—that is, whether the witness is a pathological liar or mentally incapable of telling the truth. But it is hornbook law that the credibility of a witness and the weight to be given his testimony rests exclusively with the jury."

In Rosenberg, the psychiatrist had never seen the witness and did not observe him while he testified. In any event, absent other momentous factors, it exerts a great strain on credulity to contend that a medical witness can give a legally acceptable expert opinion on the mental condition of a witness merely by observing him testify in court for a limited period. Be that as it may, considering the fact that Dr. Kushner was not prepared to state that Daileda was insane or mentally deranged and, considering further, the complete absence of a proper foundation to the offering of such evidence, the Government's objection was well taken. There may be cases where the acceptance of this type of evidence is justified, but this is not such a case.

This case was ably tried by competent counsel and the defendant has no just cause for complaint.

Therefore, after carefully considering all of the defendant's arguments, they are found to be without merit and the motion will be denied.