**UNITED STATES of America**

**v.**

**Donna B. BROWN.**

**Crim. No. K–79–054.**

United States District Court,
D. Maryland.

Oct. 10, 1979.

Russell T. Baker, Jr., U.S. Atty., Robert P. Trout and Kurt L. Schmoke, Asst. U.S. Attys., Baltimore, Md., for plaintiff.

Harold Buchman, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Donna B. Brown (Brown) was found guilty by a jury on April 16, 1979 following a trial which began on April 4, 1979 on charges of giving false testimony before a federal grand jury in violation of 18 U.S.C. § 1623.[1] Brown moved for a new trial on the following grounds:

---

1. 18 U.S.C. § 1623 states in pertinent part:

 (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declara-

tion, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The indictment in this case charged Brown, *inter alia*, as follows:

1. On or about October 30, 1978 at Baltimore, in the State and District of Maryland,

DONNA B. BROWN

having duly taken an oath as a witness before the Special Federal Grand Jury No. 2 for the District of Maryland, September 1978 Term, that she would testify truly, did willfully and knowingly and contrary to said oath make false material declarations, that is to say:

2. At the time and place aforesaid, the said Special Federal Grand Jury was engaged in an investigation of various events and circumstances relating to the earlier investigation and prosecution of *United States v. Mandel, et al.* (Criminal No. 75–0822, District of Maryland), in order to determine whether there had been committed in connection with the *Mandel* case violations of the laws of the United States, including but not limited to 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 1503 (Influencing Jurors and Obstruction of Justice).

3. It was material to the aforesaid investigation to determine what the witness DONNA B. BROWN knew about an effort that had been made in October, 1975 to persuade Diane Lawrence then a member of the federal grand jury which was then investigating matters relating to Marvin Mandel and others, to sell information about the activity of that grand jury.

4. At the time and place alleged in Paragraph 1 herein, DONNA B. BROWN appeared as a witness before the aforesaid Special Federal Grand Jury No. 2, September 1978 Term, and then and there, under oath, as aforesaid, testified falsely before the said Special Federal Grand Jury with respect to the aforesaid material matter as follows:

Q. [By Mr. Skolnik] The subject matter here is the effort in the fall of 1975 to have a Grand Juror, a woman named Diane Lawrence, then a member of the Grand Jury investigating Governor Mandel and some others, approached and offered money for her willingness to give in exchange for that money information with respect to what was going on before the Grand Jury on which she was sitting.

As I have told you earlier today, the evidence already in hand indicates that there were several people involved in the effort to do that with Mrs. Lawrence, and that among those several people was yourself.

What I would like you to do, Mrs. Brown, first, is to simply tell the Grand Jury in your own words, taking as much time as you like

. . ..

\* \* \* \* \* \*

Q. What I would like for you to do, Mrs. Brown, is just in your own words, taking as much time as you like, tell the Grand Jury the complete story of what occurred in the fall of 1975 as far as you are aware of regarding this subject matter that I just outlined to you and I will ask specific questions.

\* \* \* \* \* \*

A. [By Mrs. Brown] I don't know what you mean.

\* \* \* \* \* \*

Q. Please tell the Grand Jury everything that you know about the effort that was made to have Mrs. Lawrence approached and—

A. I know nothing about her being approached.

Q. All right, Mrs. Brown, then I will ask you one more time to please tell the Grand Jury what you know about the approach that was made to Mrs. Lawrence in or around October, 1975, asking her if she would be interested in selling, in exchange for money, information that she had about what was going on before the Grand Jury that she was a member of.

A. I know nothing.

\* \* \* \* \* \*

Q. [By Mr. Skolnik] Did Mrs. Lawrence ever inform you, Mrs. Brown, that she, Mrs. Lawrence, wanted to find out whether or not the people interested in paying her money were for real or were serious about it? She wanted to find out about that by asking them for some money up front. That is, for some money to be paid to her in advance of her giving any information?

A. [By Mrs. Brown] She never asked me anything about any of it.

Q. So the subject matter that I just asked about—the answer is no, nothing like that ever happened?

A. Correct, right.

\* \* \* \* \* \*

Q. [By Mr. Skolnik] Did Mrs. Lawrence ever indicate to you or state to you that she would like to know what it is that the people who are interested in having information from her about the proceedings before the Grand Jury—exactly what it is that they want to know?

A. [By Mrs. Brown] No.

Q. What kind of information they want to have?

A. No.

Q. Nothing like that ever happened?

A. No.

5. The aforesaid declarations of DONNA B. BROWN, as she then and there well knew and believed, were false in that 1) she did in fact have substantial knowledge about the approach that had been made to Diane Lawrence, in October, 1975, in an effort to persuade her to sell information about the activity of the grand jury of which she was then a member; 2) Lawrence had in fact told Brown that she (Lawrence) wanted to be paid some money

1. The trial court erroneously prevented the defendant from examining a hospital record pertaining to the hospitalization of the government's chief witness. The record had been subpoenaed by the defendant, and may have contained material and relevant evidence relating to the credibility and reliability of the witness or other areas of aid in cross-examination. Even though unprivileged, the court denied defendant access to the hospital record.

2. The court thus not only erred in depriving the defendant of unprivileged evidentiary matter but the denial of the access to duly subpoenaed material amounted to a denial of due process and a fair trial under the Fifth Amendment. That motion has been denied. Herein, this Court reviews and amplifies its reasons for that denial.

During 1975, a special grand jury of this Court investigated the activities of Maryland's Governor, Marvin Mandel, and others.[2] Diane E. Lawrence (Lawrence), a close personal friend of Brown, was a member of that grand jury.

During September 1978, another special grand jury investigated allegations of possible jury tampering and obstruction of justice in connection with the *Mandel* case. In late October 1978 Brown appeared before that latter grand jury and denied any involvement in or knowledge of any attempt by her in October 1975 to buy or otherwise procure information from any member of the special grand jury which had been investigating the Governor and others in Oc-

tober 1975. Brown's said October 1978 testimony formed the basis for the perjury charges for which she was convicted on April 16, 1979 and as to which her motion for new trial was filed.

Brown was indicted on February 6, 1979. Prior to trial, during a motion hearing, counsel for Brown indicated that the defense theory of the case would be that everything that Brown did or said in her discussions with Lawrence during October 1975 was a "hoax" perpetrated by Brown. Trial evidence, *i. e.*, recorded conversations, subsequently revealed that Brown discussed with Lawrence on a number of occasions, both in person and by telephone, a plan for obtaining a sizable monetary payment from one or more of the persons who, the newspapers were suggesting in October 1975, were targets of the grand jury on which Lawrence was serving. During the pre-trial period, the government proffered that its evidence against Brown would include the testimony of Lawrence, and also tape recordings of pertinent conversations between Brown and Lawrence during which Brown discussed with Lawrence the possibility that Lawrence might reveal, for money, details of matters, which according to newspaper reports, were under consideration by the grand jury on which Lawrence was serving. The tapes were obtained after Lawrence forthwith reported Brown's initial approach to her to a judge of this Court, and agreed to cooperate, at the request of the FBI, in the government's investigation of Brown's approach to Lawrence.[3] Trial was sched-

---

before disclosing any information; and, 3) Lawrence had in fact told BROWN that she (Lawrence) wanted to know what kind of information she was being asked to sell.
18 U.S.C. § 1623.

Originally, the above quoted portion was contained in Counts 2, 3 and 4 of a four (4) count indictment. Counts 2, 3 and 4 were consolidated and Count 1 was severed for later trial, at the request of defendant and with the agreement of the Government. Count 1 of the original indictment contained an allegation of grand jury tampering in violation of 18 U.S.C. § 1503. That Count, *i. e.*, Count 1, was superseded by the indictment in Criminal No. K–79–0215 in which Mrs. Brown and her husband were charged in a single count of violating 18 U.S.C.

§ 1503. Mr. and Mrs. Brown were acquitted in a jury trial in Criminal No. K–79–0215, of the charge in the single count indictment in that case. That trial took place subsequent to the trial in the within case.

**2.** On November 24, 1975 indictments were returned against Mandel and others. The convictions in that case; affirmed on appeal, *United States v. Mandel*, Criminal No. 77–2487 (4th Cir., July 20, 1979) (*en banc*), are the subject of pending motions before the Fourth Circuit.

**3.** When Lawrence reported Brown's approach, she was promptly excused by a judge of this Court from further service on the grand jury, but she continued thereafter to come to the U.

uled to commence in this case on April 4, 1979. On March 30, 1979 in a chambers conference with counsel for both sides and counsel for the hospital, this Court learned that counsel for Brown had issued a subpoena duces tecum to the custodian of records of a hospital located in the City of Balti-more, for the production of certain of its records relating to a period when Lawrence had been a voluntary psychiatric in-patient at that hospital. Brown's counsel stated that Brown desired those records for the purposes stated in the instant motion for a new trial. The government opposed such production.[4] Counsel for the hospital stated that the hospital would produce those records only under the compulsion of an Order by this Court.

Subsequently, at the request of this Court, an experienced trial attorney, a former United States Attorney for this District, agreed to act as counsel to Lawrence in the matter of the subpoena issued to the hospital. On April 2, 1979, counsel for the government, Brown, the hospital, and Lawrence, conferred in chambers with this Court, on the record, in an attempt to resolve the dispute relating to the subpoenaed records. All parties agreed that the transcript of proceedings during that *in camera* hearing should be sealed. Also by agreement, the hospital records were produced by

counsel for the hospital and were reviewed by this Court and by Lawrence[5] and her counsel. Thereafter, this Court and counsel for Lawrence stated to all counsel and to Brown that the psychiatric records related to a period of time during November, 1976, and contained nothing concerning Lawrence's service on the grand jury, nothing relating to Brown or the relationship between Lawrence and Brown, and nothing concerning the charges against Brown or the government's prosecution of Brown. Thereafter, Lawrence restated her desire to maintain the confidentiality of the records and asserted her state law privilege with respect thereto.[6] Counsel for Brown pressed his demand for production of the records under protective order for review by Brown and himself, stressing the possible usefulness of the information in the records during cross-examination and impeachment of Lawrence. The government maintained that the records were not sufficiently relevant or material to any issues, including those of credibility and reliability. Thereafter, this Court briefly examined Lawrence on the record, with her counsel present but out of the presence of counsel for the government, Brown, and the hospital. Defense counsel did not object to this Court's *in camera*[7] examination of the

S. Courthouse as though her service on the grand jury had not been terminated, all in furtherance of the government's investigative attempts to learn the identities of other persons allegedly involved in Mrs. Brown's scheme to obtain information through Lawrence.

4. There is no indication or allegation in the record that the government had any knowledge prior to learning of the defendant's subpoena for the hospital records, of Lawrence's prior hospitalization or that Lawrence had ever experienced any psychiatric problems. *Cf. United States v. McFarland*, 371 F.2d 701, 705 (2d Cir. 1966).

5. Seemingly, Lawrence saw the hospital record herself for the first time during the April 2, 1979 *in camera* hearing.

6. *See* Md. Code Ann., Courts and Judicial Proceedings § 9–109(b) (1978 Cum.Supp.).

7. Two cases decided by the District of Columbia Court of Appeals illustrate the appropriateness of *in camera* inspection by the trial court

of documents subpoenaed by defense counsel in criminal trials where highly sensitive, potentially harassing, but minimally relevant material is sought. In *Cooper v. United States*, 353 A.2d 696 (D.C.App.1976), appellant appealed his convictions on various charges growing out of a street altercation and subsequent gun battle with two off-duty police officers. Among the errors claimed by appellant to have been committed by the trial court was the court's action in quashing a defense subpoena for the personnel files of the police officers involved, one of whom was killed in the affray. In sustaining the trial court's actions, Judge Harris wrote:

* * * The government asserted a claim of privilege for the files, except those portions made public by statute. The Metropolitan Police Department's Deputy General Counsel summarized the three basic reasons for the policy of confidentiality as "the privacy of the officer, the normal personnel executive interest of the department, and also the discipline of self-policing aspect of an investigation report that might be included." Defense

records and of Lawrence, but objected at all times to any procedure or ruling which de-

counsel stated that he wished to look through the files seeking two types of material: (1) any indication of prior violent acts by Officers Boyd or Morris for use as evidence that they may have been the aggressors on this occasion, and (2) information about promotions or investigations of weapon firings which might show that Boyd had a motive for perjury.

Defense counsel was unable to proffer that he had any reason to believe that either of those two types of material would be found in the officers' personnel files. The trial judge offered to inspect the files *in camera* to determine whether they contained relevant, admissible evidence. Defense counsel rejected that offer. The court then quashed the subpoena on the grounds that "[i]t's really nothing more than a fishing expedition".

We conclude that the trial court properly sustained the challenge to the subpoena, and hence find it unnecessary to resolve the privilege question. *See United States v. Nixon*, 418 U.S. 683, 698, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Under Superior Court Criminal Rule 17(c), a subpoena duces tecum may be quashed if production of the materials sought would be "unreasonable or oppressive." In considering this standard, courts generally have followed the formulation expressed in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952). The *Iozia* test, as endorsed by the Supreme Court in the *Nixon* case, requires a party seeking a subpoena duces tecum to show the following:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a "fishing expedition." *United States v. Nixon, supra* 418 U.S. at 699–700, 94 S.Ct. at 3103.

In this case, the trial court effectively applied the standard enunciated in *Iozia*. The following exchange illustrates the record support for the finding that the defense was merely "fishing":

[*Defense Counsel*]: . . . I really don't feel that the Court is in a position to determine what may or may not be relevant to my case. I feel that there are subtleties that counsel might want to bring out that the Court may not feel are relevant, and if I were only able to see them and determine that it would be impossible for me to know, and it's certainly also impossible for me to know ahead of time what to tell Your Honor what to look for. I don't know what's even in there.

nied to Brown and himself the opportunity to review the records. Thereafter, in a

*The Court*: That's exactly what I mean by fishing.

[*Defense Counsel*]: Your Honor, I submit to the Court that I have a right to conduct a fishing expedition, if that's what it's called.

Enforcement of a subpoena under Rule 17(c) is committed to the sound discretion of the trial judge. Unless the trial court's finding is either arbitrary or without record support, its decision as to the necessity for the subpoena will not be disturbed on appeal. *See United States v. Nixon, supra* 418 U.S. at 702, 94 S.Ct. 3090. We find no indication of arbitrariness, and the trial court's finding is supported by the record. The ruling to quash the subpoena is sustained. [Footnotes omitted.]

*Id.* at 700–02. In so holding, the Court relied, in part, upon its earlier ruling in *Davis v. United States*, 315 A.2d 157 (D.C.App.1974). In *Davis*, appellant appealed his conviction on charges of assault, sodomy and related sex crimes committed upon the person of a minor boy. Appellant complained on appeal (at 161) that "he was denied constitutionally protected rights of due process, representation by counsel, and of confrontation and cross-examination * * *" in part by the trial court's refusal to permit defense counsel to examine the victim's school records. The appeals court sustained the trial court's action (at 162):

* * * The trial judge conducted an *in camera* inspection of the boy's school records after they were produced by the assistant school principal who refused to deliver them to defense counsel. When defense counsel sought to view the records he proffered that he knew nothing about the boy's background, particularly whether the boy had any prior homosexual tendencies or behavior problems. After inspecting the records, the trial judge advised counsel, ". . . I find nothing in those records and therefore, I will not permit you to examine those records." Based upon *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), appellant argues that it is the advocate who should determine the usefulness of the subpoenaed information and not the judge sitting *in camera*.

School records, for the most part, reflect academic evaluation, though to be sure behavioral and developmental evaluations may also be included. Their contents are sensitive insofar as the student and his family are concerned. *E. g., Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). Moreover, candid and complete evaluation of a child might be squelched if, without a compelling and detailed demonstration of need, teachers are subject to call for explanation

Memorandum dated April 3, 1979, this Court set forth in part its reasons for denying defense counsel's request to examine the psychiatric records and its determination of Lawrence's competency to testify.

The trial commenced on April 4, 1979. On April 16, 1979 Brown was found guilty. The instant motion for a new trial was timely filed on April 23, 1979.

Brown's pre-trial and post-trial objections to the non-production of the records were and are framed in a due process/Fifth Amendment context. However, the Sixth Amendment right to effective cross-examination of adverse witnesses also underlies Brown's contention of unfairness and prejudice. The fundamental principles that give meaning and shape to that Sixth Amendment right were set forth by Judge Carter in *Skinner v. Cardwell,* 564 F.2d 1381, 1388–89 (9th Cir. 1977) *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978):

> The Sixth Amendment right to confrontation is embodied largely by the right to cross-examine adverse witnesses. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940); *United States v. Harris,* 501 F.2d 1 (9 Cir. 1974). If the right to effective cross-examination is denied, constitutional error exists without the need to show actual prejudice. *Davis v. Alaska, supra; Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Harris, supra* at 9.

However, the defendant does not have the unrestricted right to cross-examine adverse witnesses on any matter desired. Initially the cross-examination must be shown to be relevant. The determination of relevancy is within the discretion of the trial court. *United States v. Trejo,* 501 F.2d 138 (9 Cir. 1974); *Enciso v. United States,* 370 F.2d 749, 751 (9 Cir. 1967).

Next, topics of inquiry which pass the relevancy hurdle are subject to the trial court's further discretion as to the proper extent of cross-examination. In *Alford, supra,* 282 U.S. at 694, 51 S.Ct. at 220 the Supreme Court ruled:

> "The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted. *Storm v. United States,* 94 U.S. 76, 85, 24 L.Ed. 42; *Rea v. Missouri,* 17 Wall. 532, 542–43, 21 L.Ed. 707; *Blitz v. United States,* 153 U.S. 308, 312, 14 S.Ct. 924, 38 L.Ed. 725." [Citations omitted.]

Relevancy and the proper extent of cross-examination are closely interrelated. For example, a topic which is highly material deserves extensive cross-examination. But some topics may be of such minimal relevance that the trial court would be justified either in totally prohibiting cross-examination about them or in allowing only limited questioning. [Citations omitted.]

\* \* \* \* \* \*

The test for whether cross-examination about a relevant topic was effective, i. e., whether the trial court has abused its discretion, is whether the jury is otherwise in possession of sufficient information upon which to make a discriminating appraisal of the subject matter at issue. When the refused cross-examination relates to impeachment evidence, we look to see whether the jury had sufficient information to appraise the bias and motives of the witness. [Citations omitted.]

 No general psychiatrist-patient or hospital-patient privilege is available as a bar to the production of documents under Maryland law or under the Federal Rules of Evidence (*see* Rule 501). However, in a federal criminal trial, there was and is a need to balance, on the one hand, Brown's

---

and justification of grades or other evaluation remarks made months or years earlier. We have caused the school records in this case to be included (though sealed) in the record on appeal. Our independent examination of them convinces us that no prior homosexual or other serious behavioral problems are reflected therein, and that the refusal to permit counsel to see them does not require reversal.

interest in receiving a fair trial—including the opportunity to conduct a full cross-examination and to impeach Lawrence—and, on the other hand, the need to spare Lawrence any unnecessary invasion of privacy, *see United States v. Jackson,* 576 F.2d 46, 49 (5th Cir. 1978),[8] as well as to spare her from harassment, annoyance or humiliation, *see Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931).

In *United States v. Hiss,* 88 F.Supp. 559 (S.D.N.Y.1950), Judge Goddard admitted expert psychiatric testimony offered to impeach the credibility of the chief government witness, Whittaker Chambers, during the second trial of Alger Hiss. Other federal and state courts have accorded broad latitude to counsel in the area of psychiatric cross-examination when circumstances have justified the same. In *United States v. Partin,* 493 F.2d 750 (5th Cir. 1974), *appeal after remand,* 552 F.2d 621 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), Judge Coleman, for Judges Ainsworth, Gee and himself, wrote (at 762–64):

> The basic precepts of the *Hiss* ruling have been followed in at least three Circuits: *Sinclair v. Turner,* 10 Cir., 1971, 447 F.2d 1158, cert. denied, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972); *Ramseyer v. General Motors Corporation,* 8 Cir., 1969, 417 F.2d 859; *United States v. Allegretti,* 7 Cir., 1964, 340 F.2d 254, cert. denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). Interestingly enough, except for Florida and Louisiana, all of the states comprising the Fifth Circuit have confronted this issue. Of the four, three follow *Hiss,* with Texas comprising a distinct minority of one, *Bonner v. State,* 59 Ga.App. 737, 1 S.E.2d

768 (1939); *Walley v. State,* 240 Miss. 136, 126 So.2d 534 (1961); *Brown v. State,* 45 Ala.App. 391, 231 So.2d 167 (1970); *Hopkins v. State,* 480 S.W.2d 212 (Tex.Cr. App., 1972).

> The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility to aid in their determination of the truth, *Walley v. State, supra.* It is just as reasonable that a jury be informed of a witness's mental incapacity *at a time about which he proposes to testify* as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know, and correctly relate the truth.
>
> \* \* \* \* \* \*
>
> Partin had the right to attempt to challenge Rogers' credibility with competent or relevant evidence of any mental defect or treatment *at a time probatively related to the time period about which he was attempting to testify.*
>
> \* \* \* \* \* \*
>
> \* \* \* the jury was entitled to know and consider *that a few months before the alleged occurrence of the crime charged in the indictment,* Rogers voluntarily committed himself to a hospital, reporting auditory hallucinations [hearing things that were not there] and also complaining that at times he thought he was some other person. Moreover, this was a direct refutation of Rogers' prior denial that he entered the hospital for mental treatment. [Emphasis Added.]

The stress in *Partin* upon the temporal nexus between the alleged incapacity of the witness and the subject matter of the witness' testimony reflects the view that rele-

---

8. *Jackson* involved a claim that the trial court erred in refusing to order mental and physical examinations of certain witnesses. While in this case a review of records rather than any additional examination was sought, what was stated in *Jackson* applies with equal force herein:

> \* \* \* a court-ordered medical examination is an infringement on a witness' privacy, and this factor must be taken into account by the district court. As the district judge said *in the instant case:*

> Such an examination may seriously impinge on a witness' right to privacy, very high on any scale of balancing rights. The examination itself could serve as a tool of harassment, and the likelihood of an examination could deter witnesses from coming forward, producing a chilling effect on crime detection.
>
> *Id.* at 49.

vancy, materiality and the proper scope of cross-examination are "closely interrelated," see *Skinner v. Cardwell, supra* at 1389.

The discretionary power of the trial court to permit or not to permit a particular inquiry in a criminal trial has oft been emphasized.[9]

In *United States v. Barnard*, 490 F.2d 907 (9th Cir. 1973), *cert. denied* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), Judge Duniway commented that the procedures employed in the *Hiss* case are the exception rather than the rule and that the exercise of a trial judge's discretion " 'is to be sustained unless manifestly erroneous.' [Citation omitted]." [10]

■ This case does not involve any allegation that Lawrence was under the influ-

**9.** In *United States v. Wertis*, 505 F.2d 683 (5th Cir. 1974) (*per curiam*), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975), defendant appealed his conviction on three counts of conspiracy to conduct and abet illegal gambling and conspiracy to obstruct Florida law. A panel of the Fifth Circuit, consisting of Judges Gewin, Ainsworth and Gee, the latter two of whom had decided *Partin*, stated (at 685):

Wertis' final complaint which merits brief discussion is that the court erred in refusing to permit a psychiatrist to opine [5] whether a principal prosecution witness " . . . would . . . have a tendency to be reliable as a witness in distinguishing the truth from non-truth, realities from fantasies . . . ." Such a question as that proffered is beyond the competence of any witness. Peeled of its thin veneer of jargon, it amounts to no more than an inquiry whether the witness is to be believed by the jury or not. And though it approaches somewhat to the admissibility line, it lies at about the same distance on its wrong side as those approved in *Partin* lie on its right. These concerned the existence vel non of a deviant mental condition and the effect of that condition on the witnesses' capacity to see and hear. The *Partin* inquiries test the witnesses' capacity and competence; the instant ones place the psychiatrist in the posture of a compurgator (or anti-compurgator).

[5] The point is wrapped (and well-nigh concealed) in another: complaint of the exclusion of certain medical records upon which the excluded testimony would be based. Since they were offered solely for this impermissible purpose, their exclusion at that point was not harmful.

[Footnote 6 omitted.]

See also *United States v. Jackson*, 576 F.2d at 49:

* * * psychiatric opinions as to a witness' reliability in distinguishing truth from fantasy is inadmissible for impeachment purposes, for it invades the jury's province to make credibility determinations.

**10.** *Barnard* was a drug conspiracy prosecution in which a codefendant, Dillon, testified for the government. In that case, defendants sought to impeach Dillon's competency as well as his credibility through the use of expert psychiatric testimony based upon the contents of a twelve-year-old psychiatric record, admission of which was also sought. In affirming the trial court's rulings in those regards, Judge Duniway wrote (at 912–13):

a. *Expert Testimony as to Dillon's Competency to Testify*

On November 5, 1972, two days before the beginning of trial, it came to the attention of the defendants that Dillon had had psychiatric problems which had led to his discharge from the United States Army in 1960. The defendants asked the court to order a psychiatric examination of Dillon to determine whether he would be a competent witness. The court conducted its own voir dire examination of Dillon outside the presence of the jury, and, satisfied that Dillon would be a competent witness, denied the defendants' request.

When a question is raised as to the competency of a witness to testify, it is for the judge to decide. He may call to his aid the testimony of expert witnesses. This was done in *District of Columbia v. Armes*, 1882, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618. *See also United States v. Hiss*, S.D.N.Y., 1950, 88 F.Supp. 559. Neither these cases, nor any others that have come to our attention, require that he call or hear experts on the question. Necessarily, the judge must have, and does have, considerable discretion in the matter. It has been held not to be an abuse of discretion to refuse to hear such evidence under circumstances quite similar to those before us: *United States v. Skillman*, 8 Cir., 1971, 442 F.2d 542, 560; *United States v. Lee Wan Nam*, 2 Cir., 1960, 274 F.2d 863, 864–865. We find no abuse of discretion here.

b. *Expert Testimony as to Dillon's Credibility*

Defendants offered the testimony of a psychiatrist and a psychologist, who were called to testify as to their opinions of Dillon's competency and reliability as a witness. Each had read over the record of Dillon's Army psychiatric evaluation and his grand jury testimony, and had observed Dillon for part of the time when he was testifying in court. On the basis of this familiarity with Dillon, each had formed the opinion that Dillon was a

ence of drugs or alcohol at any time and certainly not at or close to the time of trial or any date relevant to any issue, including the issue of Lawrence's credibility posed by the charges against Brown. If such were not so, this Court's discretionary authority to limit cross-examination would have been considerably more circumscribed. Thus, Judge Choy wrote, in an appeal from a bank robbery conviction in *United States v. Kizer,* 569 F.2d 504, 505–06 (9th Cir.), *cert. denied,* 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978):

> Before government witness Katie Nelson testified, the trial court granted the prosecutor's motion to prevent defense counsel from inquiring into Nelson's past

drug use and hospitalization for drug addiction. *Kizer* argues that the court's ruling deprived her of the broad scope of cross-examination guaranteed by the sixth amendment. *See, e. g., Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1975). It is established, however, that cross-examination may be limited where the sixth amendment interest is outweighed by the danger of harassing witnesses or unduly prejudicing the jury. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The proper extent of cross-examination lies within the sound discretion of the trial court. Fed.R.Evid. 403, 608(b), 611(a); *Skinner v. Cardwell,* 564 F.2d 1381, 1388–

sociopath who would lie when it was to his advantage to do so. The offer was rejected.

As we have seen, competency is for the judge, not the jury. Credibility, however, is for the jury—the jury is the lie detector in the courtroom. Judges frequently instruct juries about factors that the jury may or should consider in weighing the veracity of a witness. In this respect it can be said that judges assume that they have certain expertise in the matter, and that juries have less of that expertise than judges. It is now suggested that psychiatrists and psychologists have more of this expertise than either judges or juries, and that their opinions can be of value to both judges and juries in determining the veracity of witnesses. Perhaps. The effect of receiving such testimony, however, may be two-fold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral but still an important matter. For these reasons we, like other courts that have considered the matter, are unwilling to say that when such testimony is offered, the judge must admit it. *See United States v. Rosenberg,* S.D.N.Y., 1952, 108 F.Supp. 798, 806, aff'd, 2 Cir., 1952, 200 F.2d 666; *United States v. Daileda,* M.D.Pa., 1964, 229 F.Supp. 148, 153–154.

The admissibility of the proffered testimony was for the judge, and in deciding whether to admit expert testimony, "the trial judge has broad discretion . . . and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines,* 1962, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313. Here we find no abuse of discretion. The experts' knowledge about Dillon was limited, to say the least. Dillon's credibility was otherwise suspect, as a co-defendant testifying for the government, and as having perjured himself before the grand jury. We

have grave doubt that the expert testimony would have helped the jury. Under the Constitution, Article III, § 3, trial of criminal cases in Federal courts is by jury, not by experts. We think that the testimony of the type offered in this case should be received only in unusual cases, such as *United States v. Hiss, supra.* And by referring to that case we are not saying that it would have been error to exclude the testimony there offered and received.

c. *Exclusion of a Medical Record as Related to Dillon's Credibility*

Defendants argue that Dillon's Army psychiatric evaluation should have been admitted into evidence, so that the jury might consider it in assessing Dillon's credibility. After conducting its voir dire of Dillon, the court excluded the report on the grounds that it was of dubious probative value because it reflected proceedings occurring some twelve years before trial, and that the report dealt with a personality disorder which was not severe enough to bear upon the question of competency. The court felt that any probative value the report might have would be offset by its prejudicial effect on the jury.

The court did not abuse its discretion. *See,* III A Wigmore, Evidence, § 932 (Chadbourn rev. 1970); Rule 403, Proposed Federal Rules of Evidence.

*See also United States v. Haro,* 573 F.2d 661, 666–68 (10th Cir.), *cert. denied,* 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 155 (1978) and *United States v. Brumbaugh,* 471 F.2d 1128, 1129 (6th Cir.) (*per curiam*), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973); *United States v. Matanky,* 482 F.2d 1319, 1324 (9th Cir.), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); *United States v. Mucherino,* 311 F.2d 172, 173–75 (4th Cir. 1962).

89 (9th Cir. 1977). The trial court may limit or even prohibit a proffered line of inquiry that is minimally relevant. *Id.* at 1389.

Defense counsel sought to cross-examine Katie Nelson about her past drug addiction to show her motive, bias, and interest in testifying on the theory that Nelson, as a drug addict, had an inordinate interest in receiving funds from law enforcement agencies in exchange for incriminating testimony. The trial court allowed inquiry into any payments Nelson might have received in exchange for testifying. The court refused, however, to allow inquiry into her hospitalization for drug treatment and ruled that such hospitalization was not logically relevant to Nelson's motivation, bias, or interest in testifying. We find nothing in the record to suggest that the trial court abused its discretion in so ruling.

The cases that allow broad cross-examination on the issue of drug addiction to impeach witnesses are readily distinguishable. Such cross-examination may be necessary where defense counsel seeks to impeach narcotics addicts who are paid government informers with criminal charges pending against them, *United States v. Kinnard,* 150 U.S.App.D.C. 386, 392–95, 465 F.2d 566, 572–75 (1972), or who had criminal charges against them dropped prior to trial, *United States v. Masino,* 275 F.2d 129, 132 (2d Cir. 1960), or where the fact of addiction is probative of other motivation for testifying, *United States v. Fowler,* 151 U.S.App. D.C. 79, 83, 465 F.2d 664, 668 (1972) (cross-examination as to drug addiction allowed where such addiction may have led to dismissal of witness from police force), or where the witness is intoxicated while testifying, *Wilson v. United States,* 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728 (1914). The record here reveals no such bases for allowing cross-examination on drug addiction. Moreover, there is widespread recognition that drug addition is an issue fraught with potential prejudice:

The issue of narcotics use is one that may properly be handled with some sensitivity lest it result in undue and unnecessary prejudice. There is an interest in avoiding undue evidentiary assault on prosecution witnesses. Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use.

*United States v. Kearney,* 136 U.S.App. D.C. 328, 420 F.2d 170, 174 (1969) [citation omitted].

Our review of the trial transcript assures us that Nelson was a reasonably lucid witness. The trial court's exercise of discretion in foreclosing impeachment on the drug addition issue was not improper. *United States v. Cole,* 457 F.2d 1141, 1143 (9th Cir.), *cert. denied,* 409 U.S. 868, 93 S.Ct. 166, 34 L.Ed.2d 117 (1972).

We also note in passing that defense counsel did not offer to prove that Nelson used drugs either during the period covered in her testimony or during the trial itself. The failure to lay a proper foundation to impeach a witness may preclude appellate relief. [Citations omitted.]

*Cf. United States v. Crosby,* 149 U.S.App. D.C. 306, 462 F.2d 1201 (D.C.Cir. 1972).

■ Nor is this a case in which Lawrence's credibility as to the contents of her conversations with Brown is in issue in view of the fact that the tape recordings and verbatim transcripts of the conversations relating to which the alleged perjurious testimony was given constituted the principal evidence produced by the Government. Defense counsel contends that Lawrence's belief or understanding as to whether Brown's actions were nothing more than a ruse or a hoax was so material and relevant in this case that Lawrence's testimony in that regard needed to be elicited by the defendant and then impeached for its lack of credibility and reliability by use of the psychiatric records. However, in this case, the jury heard for itself the lengthy taped conversations in which Brown and Lawrence took part. The jury heard the words and the tones of voice. The jury also heard testimony of Brown's husband and of a witness

**1258**

with whom Brown discussed the information—pay off proposal.

 During trial, defense counsel questioned Lawrence generally concerning the latter's mental and emotional state. In addition, Brown testified in detail concerning her close personal relationship with Lawrence and in so doing alluded to the fact that Lawrence had mental and emotional problems during the course of that relationship. Thus, in balancing the factors to be weighed in the course of its exercise of its discretionary authority, this Court was not faced with a situation in which Brown's counsel was totally unable to utilize Lawrence's alleged emotional instability to further Brown's, as opposed to Lawrence's, interpretation of the entire affair as a "hoax" and Brown's theory that she testified as she did before the grand jury because she had considered the matter a "hoax" and had forgotten entirely about her very lengthy conversations with Lawrence. Additionally, in the absence of any allegation that Lawrence withheld any information or failed to tell the truth, except as to her perception of the matter as a non-hoax, Lawrence, as a person who seemingly did her duty as a grand juror in promptly reporting to a judge of this Court Brown's initial approach to Lawrence and thereafter in fully cooperating with the FBI in the government's investigation of a very serious grand jury tampering charge, is a citizen entitled to some protection of her personal records and of her privacy and to protection against undue harassment and humiliation.

Accordingly, this Court hereby reaffirms its denial of defendant's motion for a new trial.